UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,

                     - against -                         19 CR 717 (LAK)

DEMETRUES BELL,
                     Defendant.
------------------------------------------------------------------x

## DEFENDANT DEMETRUES BELL'S MEMORANDUM
## OF LAW IN SUPPORT OF HIS PRE-TRIAL MOTION

### PRELIMINARY STATEMENT

Demetrues Bell is charged in an indictment with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He has pleaded not guilty. Mr. Bell respectfully submits this Memorandum of Law in support of his pre-trial motion for an Order: (1) suppressing the evidence seized by law enforcement after he was illegally searched and seized in violation of his Fourth Amendment rights; (2) suppressing his post-arrest statements elicited by law enforcement prior to being read the <u>Miranda</u> warning as fruits of an illegal search and seizure and in violation of his Fifth Amendment rights; or (3) granting an evidentiary hearing on this motion; and (4) for such other and further relief as this Court may deem just and proper.

### BACKGROUND

Around 4:00 PM on June 28, 2019, Mr. Bell was sitting in his car with the engine running in front of a grocery store on 137th street, having just dropped off his friends on his way home from work. <u>See</u> Decl. of Ian Marcus Amelkin Ex. A

(Declaration of Demetrues Bell ¶ 7); Ex. B ¶ 3b (Complaint); Ex. D (video surveillance). Mr. Bell worked for the New York City Housing Authority as a caretaker and was heading to 578 E 141st Street in the Bronx, where he lived with his girlfriend and mother. Ex. A. ¶¶ 3–4. He has lived in New York City his entire life. Ex. A. ¶ 2.



After Mr. Bell's friends exited his car, an unmarked New York Police Department ("NYPD") car drove past him, traveling west on 137th Street. Mr. Bell drove west on 137th Street and turned north on St. Ann's Ave. Ex. A ¶ 9; Ex. B ¶ 3d. After he turned, a second NYPD car pulled him over at the corner of 139th Street and

St. Ann's. Id.; Ex. D. Mr. Bell's account of what happened next varies from the sworn statements in the Complaint.

I. THE EVENTS AS DESCRIBED BY THE ARRESTING OFFICERS.

Police Officer 1 ("PO-1") was seated in the rear passenger seat of the first car that passed Mr. Bell. Id. ¶ 3b. From this position, PO-1 said he smelled marijuana emanating from Mr. Bell's car.

> b. While the Officers traveled westbound on 137th Street toward the direction of Saint Ann's Avenue, the Officers in the lead car (PO-1 and PO-2) observed a vehicle (the "Vehicle") double-parked and facing westbound with the engine running. As the Officers in the lead car passed the double-parked Vehicle at a slow rate of speed, PO-1 observed that the Vehicle's windows were open and that there was a strong odor of marijuana coming from the Vehicle, which was occupied by one individual in the driver's seat. At the time, PO-1 was seated in the rear passenger seat of the Officers' lead car with the window open and an unobstructed view of the Vehicle.

Id.

When the officers approached the car, they allege that they continued to smell marijuana and observed "in the center console a marijuana cigarette." Id. ¶ 3e. At this point, the officers asked Mr. Bell to exit the car. After he complied, they patted him down, moved him to the rear of the car and handcuffed him. Id. ¶ 3f. As they were doing this, one of the other officer's approached the passenger window and observed Mr. Bell's backpack. The complaint states that this officer, PO-3, observed that the bag was open and he saw a firearm cartridge sticking out of it in plain view.

> g. PO-3, who approached the front passenger side of the Vehicle, observed through the open window a camouflage backpack on the front passenger seat. PO-3 observed that the backpack was open and could see from his vantage point outside the Vehicle that it contained a transparent firearm cartridge containing multiple rounds of ammunition.

Id. ¶ 3g. PO-3 then searched the bag and found a handgun inside. The officers placed Mr. Bell under arrest and vouchered the gun and ammunition. See Ex. C (body camera video); Ex. H (voucher for the gun and ammunition). Mr. Bell was not read his Miranda rights until he was inside the precinct. See Ex. C.

On the way to the precinct, Officer Juan Candelario asked Mr. Bell several questions while he was in custody and prior to being read his Miranda rights. See Ex. C (Juana Candelario body camera footage). These questions are captured on video. Id.

The arresting officers filled out various complaint and arrest reports pursuant to NYPD policy. See Ex. E (various NYPD reports). Based upon these reports, Mr. Bell was initially charged with various weapon possession charges in Bronx County, New York on June 29, 2019. See Ex. F (Bronx complaint). His case was then brought in the Southern District of New York via complaint on September 25, 2019, and he was indicted on October 7, 2019. See Ex. G (indictment). The Bronx County case has since been dismissed and sealed.

II. THE EVENTS AS DESCRIBED BY MR. BELL AND SUPPORTED BY VIDEO EVIDENCE.

Neither Mr. Bell nor the people in his car were smoking marijuana on the day of his arrest. Ex. A ¶ 7. Mr. Bell has been tested regularly by his New York parole

4

officers since his release from prison, and he has never tested positive for any illegal substances. Id. ¶ 5. The video evidence does not show any smoke emanating from Mr. Bell's windows prior to the NYPD stopping his car. See Ex. C. While Mr. Bell's passenger window was down because he was speaking to his friends on the sidewalk, his driver's side window was closed.

After Mr. Bell turned onto St. Ann's Avenue, the officers pulled him over and requested over their loudspeaker for him to lower all of his windows. Id. ¶ 10. Multiple officers approached his car, and one of them asked for his license and registration, which he provided. Id. ¶ 11. The officers asked him what he purchased from the store, and he told them about the black and mild cigar, which was still unopened inside the car. Id. The black and mild cigar package can be seen in the body camera video, as the officers placed it on top of the car after Mr. Bell's arrest. See Ex. C.

After this exchange, the officers requested Mr. Bell exit the car, which he did. Ex. A. ¶ 12; Ex. D (street surveillance footage). The police immediately patted him down and asked him to move to the back of the car, where he was handcuffed. Id.; Ex. C (body camera footage); Ex. A ¶ 12. Mr. Bell was fully compliant with the officers' requests.

While Mr. Bell was being patted down and handcuffed, two officers were on the passenger side of the car. One of these officers, which the defense believes to be Yahkeem White based upon the body camera footage, reached into the car and removed Mr. Bell's backpack. See Ex. D (Yakheem White body camera footage; Chistopher Medina body camera footage); Ex. C (street surveillance footage). This

5

backpack was on the floor of the passenger compartment and was sealed. Officer White then unzipped the bag and searched inside of it. See id. Inside Mr. Bell's backpack were his work pants as well as the gun and ammunition. See Ex. H. Officer Medina alerted the other officers to the gun and they placed Mr. Bell into the NYPD unmarked van. While in the van, Office Candelario interrogated Mr. Bell prior to him being read his Miranda rights. Ex. D (Juan Candelario body footage).

### III. THE BODY CAMERA FOOTAGE DOES NOT SUPPORT THE OFFICERS' DESCRIPTION OF EVENTS.

NYPD policy requires officers to activate their body cameras "prior to" interacting with "persons suspected of criminal activity" and conducting "vehicle stops." Ex. I at 2. This policy is mandatory. Id. at 1. None of the five officers who supplied body camera footage followed NYPD policy in this case, as each turned on their cameras only after Mr. Bell was out of the car and in NYPD custody. It also appears in the videos that some of the officers covered their cameras in order to muffle or mute the audio. See Ex. D. Having a full video of what happened when the officers approached the car and searched Mr. Bell's backpack would establish that Mr. Bell, and not the officers, recounted the events of his arrest truthfully.

Nonetheless, the video evidence that was provided by the Government supports Mr. Bell's affidavit. First, the video surveillance in Exhibit C shows Officer White unzipping the backpack outside of the car. Second, Officer Medina's body camera footage shows him doing so as well. Ex. D (Chistopher Medina). Third, Officer White's camera does not point down and show the clip or ammunition in plain view, which is critical to the Government's case. Instead, his camera is turned on while he

6

appears to be unzipping the backpack to search it. Id. (Yahkeem White). None of the body camera videos show marijuana smoke, marijuana burning, the marijuana cigarette recovered, the backpack unzipped in the car prior to Officer White removing it, or the clip protruding from the backpack in plain view. Instead, the Court is left with the officers' word—rather than unimpeachable video evidence that policy required them to record—that they smelled marijuana and that the ammunition was in plain view. The defense does not believe that the police officers' version of events will stand up to scrutiny.

**ARGUMENT**

I. MR. BELL'S FOURTH AMENDMENT RIGHTS WERE VIOLATED AND THE EVIDENCE SEIZED FROM HIS PERSON SHOULD BE SUPPRESSED.

a. STANDARD

The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 454–55 (1971). The government bears the burden to show that such an exception applies. Id. at 455.

Here, it seems the Government will rely on the "automobile" exception and the "plain view" exception. The automobile exception permits the police to search a "readily mobile" car if they have probable cause to believe it contains contraband. United States v. Jones, 893 F.3d 66, 70 (2d Cir. 2018) (quoting Maryland v. Dyson,

527 U.S. 465, 466 (1999)). Specifically, the complaint suggests that the officers had probable cause to believe Mr. Bell had marijuana in the car. Then, for the search of the bag, the officers stated they saw ammunition in plain view which allowed them to search Mr. Bell's backpack and recover the gun and bullets pursuant to the "plain view" doctrine. See United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999).

    b. THE OFFICERS LACKED PROBABLE CAUSE TO SEARCH MR. BELL'S BACKPACK.

For the Government to meet its burden, two things must be true: 1) the officers smelled marijuana emanating from Mr. Bell's car and 2) the ammunition clip in Mr. Bell's backpack was sticking out of the bag and in plain view. The defense submits that, after a hearing, the Court will not be able to make either determination.

The evidence is not consistent with Mr. Bell having been smoking marijuana. First, the Government is asking the Court to credit that an officer in the rear passenger seat can smell marijuana across a lane of traffic—emanating from one open window—on Mr. Bell's passenger side and to know that the marijuana came from that car rather than from somewhere else on a busy Bronx street. Second, none of the video evidence corroborates that marijuana smoke was emanating from Mr. Bell's car either in the street surveillance or in the body camera footage. See Exs. C & D. Third, the officers do not alert each other to the presence of marijuana; there is no discussion of marijuana in the body camera footage once they arrest Mr. Bell; nor does Mr. Bell appear to be under the influence of the drug. See id. Fourth, Mr. Bell has been on parole for two years and has been tested regularly for drug use, including marijuana. He has never once tested positive. Ex. A ¶ 5. Fifth, although the officers vouchered

8

the butt of a marijuana cigarette, there is nothing in the record that demonstrates that a cigarette was burning or if one had been long extinguished. Nor is there anything in the record to demonstrate that it was Mr. Bell's marijuana. "Mere proximity" to contraband in a car is "insufficient to support a finding of constructive possession." United States v. Rodriguez, 392 F.3d 539, 548 (2d Cir. 2004) (collecting cases). Even when an individual is found "in his own car," more is needed to show that he criminally possessed the contraband in it. Id.

Beyond the evidence in this case, the defense respectfully submits that pretextual claims of marijuana odor to justify car searches are apparently so common with NYPD witnesses that one judge has called them "ubiquitous," saying: [T]he time has come to reject the canard of marijuana emanating from nearly every vehicle subject to a traffic stop. So ubiquitous has police testimony about odors from cars become that it should be subject to a heightened level of scrutiny if it is to supply the grounds for a search. New York v. Jesse Hill et al., Ind. No. 853-2017 (Bronx Sup. Ct. July 25, 2019) (Newbauer, J.) at 7 (attached as Exhibit I). Moreover, in interviews with the New York Times, a detective stated that he "had come to believe that some officers, particularly in plainclothes units, lied about having smelled marijuana because of how frequently he heard it used as justification for a search." Joseph Goldstein, Officers Said They Smelled Pot. The Judge Called Them Liars," N.Y. TIMES (Sept. 12, 2019) (reporting that "several officers said in interviews that they had doubts their colleagues consistently told the truth about what they had smelled"). Unfortunately, the defense believes the same pretextual justification exists here.

9

Just as the defense challenges the Government's contention that the officers smelled marijuana, we challenge the contention that the ammunition clip was in plain view. Mr. Bell's backpack was zipped tight and his work pants were covering the gun and ammunition inside the bag. Ex A ¶ 6. Had Officer White saw the ammunition in plain view, he would have recorded that with his body camera. The videos demonstrate that the officers were not truthful about seeing the ammunition, and this lack of honesty should establish that the officers lack credibility as to the smell of marijuana as well. See Exs. C & D.

If the Court agrees that the officers' version of events is not credible, the proper remedy is suppression. "It is well-settled that evidence obtained pursuant to an unlawful seizure or search must be suppressed as the fruit of the poisonous tree." United States v. Valentine, 591 F. Supp. 2d 238, 242 (E.D.N.Y. 2008) (citing Wong Sun v. United States, 371 U.S. 471, 484–85 (1963)). Suppression must include any physical evidence gathered as a result of the illegal seizure or search. See, e.g., United States v. Murphy, 703 F.3d 182, 187-88 (2d Cir. 2012) (affirming suppression of 21 kilograms of cocaine and other physical evidence found during illegal car stop).

Under this standard, all physical evidence obtained from Mr. Bell's car should be suppressed as the fruit of the illegal stop, search, and seizure. Mr. Bell's post-arrest statements should also be suppressed as fruit of this illegal arrest. Pretzantzin v. Holder, 736 F.3d 651, 646 (2d Cir. 2013) ("The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless

10

arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated.") (internal quotation marks omitted).

II. MR. BELL'S FIFTH AMENDMENT RIGHTS WERE VIOLATED AND HIS STATEMENTS SHOULD BE SUPPRESSED.

   a. STANDARD

The Fifth Amendment of the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." The Supreme Court has construed this protection to mean that custodial interrogation cannot occur before a suspect has been informed of his Miranda rights. Miranda v. Arizona, 384 U.S. 436 (1966). Custodial interrogation is inherently coercive, and as such suspects must be informed of their rights before they freely decide to forgo those rights. New York v. Quarles, 467 U.S. 649, 654 (1984). Any statement made during a custodial interrogation must be suppressed unless police advise the defendant of his Miranda rights and he knowingly, intelligently, and voluntarily waives those rights. Miranda, 384 U.S. at 444, 479.

   b. MR. BELL WAS IN CUSTODY WHEN HE WAS INTERROGATED AND HIS STATEMENTS SHOULD BE SUPPRESSED.

A person is in custody when a reasonable person would not feel at liberty to terminate the interrogation and leave. Howes v. Fields, 565 U.S. 499, 509 (2012). Given that Mr. Bell was handcuffed in the back of a police car with several officers around him, it is clear that he was in custody.

An interrogation consists of "express questioning or its functional equivalent," which aptly describes the interaction between Officer Candelario and Mr. Bell.

11

See Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980). Officer Candelario asked Mr. Bell several questions including where he got the gun, if he has any "beef" with other people on the street, who the gun actually belongs to and other questions about how Mr. Bell came into possession of the gun. Ex D (Juan Candelario body camera). Officer Candelario's direct questions were not benign conversation, but were instead reasonably likely to elicit incriminating responses. Because Mr. Bell was not yet advised of his Miranda rights, all of his statements in the van on the way to the precinct must be suppressed. Miranda, 384 US at 444.[1]

## CONCLUSION

For all the foregoing reasons, Mr. Bell respectfully requests that the Court grant his motion to suppress the physical evidence recovered from his backpack and his pre-Miranda, post-arrest statements. In the alternative, Mr. Bell respectfully requests that the Court hold an evidentiary hearing to resolve any factual disputes, of which there are many in this case. See United States v. Pena, 961 F.2d 33, 339 (2d Cir. 1992) (requiring a hearing where a defendant raises a "sufficiently definite, specific, detailed, and nonconjectural" factual basis for suppression). Mr. Bell also respectfully requests the opportunity to submit additional legal briefing following a hearing, if necessary.

---

[1] Once at the precinct Mr. Bell was read his Miranda rights. He immediately invoked his right to counsel and requested a lawyer. He was not questioned further by the officers.

12

Dated: New York, New York
December 9, 2019

                                              Respectfully submitted,
                                              Federal Defenders of New York, Inc.

By: _____

TAMARA L. GIWA, ESQ.
IAN H. MARCUS AMELKIN, ESQ.
Federal Defenders of New York, Inc.
Attorneys for Defendant
**Demetrues Bell**
52 Duane Street - 10th Floor
New York NY 10007
Tel.: (212) 417-8733