K1EVBELH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 CR 717 (LAK)

DEMETRUES BELL,

                Defendant.              SUPPRESSION HEARING

------------------------------x

                                        New York, N.Y.
                                        January 14, 2020
                                        2:15 p.m.


Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge


                        APPEARANCES


GEOFFREY S. BERMAN,
        United States Attorney for the
        Southern District of New York
NICHOLAS S. BRADLEY
NICHOLAS S. FOLLY
        Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK INC.
        Attorneys for Defendant
IAN H. MARCUS AMELKIN
TAMARA L. GIWA


ALSO PRESENT:  ARIELLA FETMAN, Paralegal, USAO
               JAMA JOSEPH, NYPD
               JASON FISCHER, Paralegal, FDNY
               ALONDRA REYES, Paralegal, FDNY

1          (Case called)

2          THE DEPUTY CLERK:  Government, are you ready?

3          MR. BRADLEY:  Yes, your Honor, the government is

4   ready.

5          THE DEPUTY CLERK:  Defendant, are you ready?

6          MR. MARCUS AMELKIN:  Yes, your Honor.

7          THE COURT:  Okay.

8          THE DEPUTY CLERK:  Please be seated.

9          THE COURT:  Government's first witness please.

10         MR. BRADLEY:  Yes, your Honor.

11         The government calls Officer Christopher Medina to the

12  stand.

13         And your Honor, if I may, there is a binder before you

14  with the government's exhibits.  There is a separate binder

15  that I can walk up to Mr. Mohan containing the witness's

16  exhibits, which are the same as what is before the Court.

17         THE COURT:  Okay.

18  CHRISTOPHER MEDINA,

19      called as a witness by the Government,

20      having been duly sworn, testified as follows:

21         THE COURT:  Proceed, counsellor.

22         MR. BRADLEY:  Thank you, your Honor.

23  DIRECT EXAMINATION

24  BY MR. BRADLEY:

25  Q.  Good afternoon, sir.

1          Where do you work?

2    A.   Police Service Area 7.

3    Q.   Is that also referred to as PSA-7?

4    A.   Yes, it is.

5    Q.   Is that part of the New York City Police Department?

6    A.   Yes, it is.

7    Q.   What is your title there?

8    A.   Police officer.

9    Q.   How long have you been with the New York City Police

10   Department?

11   A.   Eight years.

12   Q.   What is your educational background, sir?

13   A.   I hold a bachelors in social work and associates in graphic

14   design.

15   Q.   Is PSA-7 your current station?

16   A.   Yes, it is.

17   Q.   What is PSA-7?

18   A.   PSA-7 is housing police.

19   Q.   Where is it located?

20   A.   737 East 156th Street in the Bronx.

21   Q.   Is your command borough-wide in the Bronx?

22   A.   No, it is.  Not we cover the confines of the 40th and 42nd

23   precinct.

24   Q.   What is your current assignment on PSA-7?

25   A.   Anticrime patrol.

1    Q.  What are your responsibilities on anticrime patrol?

2    A.  Anticrime patrol is a unit -- a plainclothes unit in which

3    we seek out felonious activities.

4    Q.  Did you attend a police academy?

5    A.  Yes, I did.

6              THE COURT:  Let's cut to the chase?  This isn't the

7    first rodeo.

8              MR. BRADLEY:  Understood, your Honor.

9    Q.  I'd like to direct your attention to June 28th, 2019.

10             Were you on duty that day?

11   A.  Yes, I was.

12   Q.  And was that still anticrime patrol?

13   A.  Yes.

14   Q.  What locations were you patrolling?

15   A.  The confines of the 40th and 42nd precinct.

16   Q.  Were you alone or were other officers involved in the

17   patrol at this time?

18   A.  There were other officers involved.

19   Q.  Who were they?

20   A.  Officers Candelario, Officer White, Officer Pando, and

21   Sergeant Bletcher.

22   Q.  Were you and other officers in uniform or in plain clothes?

23   A.  In plain clothes.

24   Q.  Were your badges displayed?

25   A.  Yes.

1   Q.  Were you traveling on foot or by car?

2   A.  By car.

3   Q.  How many cars were traveling in your group?

4   A.  Two.

5   Q.  Were these marked or unmarked police cars?

6   A.  They were unmarked.

7   Q.  Which of these cars were you in?

8   A.  I was in a black four-door sedan.

9   Q.  Who was else in your car?

10  A.  Officer Candelario and Sergeant Bletcher.

11  Q.  Who was driving?

12  A.  Sergeant Bletcher.

13  Q.  Where were you sitting, Officer Medina?

14  A.  The rear passenger seat.

15  Q.  Were your windows on the passenger side open or closed?

16  A.  They were slightly open.

17  Q.  Were the windows on the front passenger side open or

18  closed?

19  A.  They were open.

20  Q.  Who was in the second patrol car?

21  A.  Officer White and Officer Pando.

22  Q.  What kind of car was that?

23  A.  A black van.

24  Q.  Was your car traveling in front of or behind the black van?

25  A.  In front of.

1    Q.  Approximately how close were these two cars traveling

2    during your patrol?

3    A.  Approximately three car lengths.

4    Q.  Focusing now on that same day, June 28th, 2019, I'd like to

5    direct your attention to approximately 3:55 p.m.

6         Were you involved in any car stops around this time?

7    A.  Yes, I was.

8    Q.  Please describe the make and model of the car that was

9    stopped.

10   A.  It was a white Honda Accord.

11   Q.  Who was the driver of that car?

12   A.  Demetrues Bell.

13   Q.  Do you see that person sitting in court today?

14   A.  Yes.

15   Q.  Will you please identify him and describe an article of

16   clothing he's wearing.

17   A.  He's in at counsel; has dyed, long dreadlocks.

18        MR. BRADLEY:  Let the record reflect that the witness

19   identified the defendant, Demetrues Bell, who's sitting at

20   counsel table.

21        THE COURT:  Yes.

22   Q.  Officer Medina, why did you decide to stop the car?

23   A.  While on patrol, we passed by Mr. Bell's car; observed that

24   he was double-parked in front of the location with the engine

25   running, his windows down.  As we passed his vehicle, we

1    smelled a strong, pungent odor of marijuana emanating from the

2    vehicle, at which point conversed with the other officers in

3    the vehicle, and indicated that we were going to stop the

4    vehicle.

5    Q.  Approximately where did you first see the defendant's car?

6    A.  In front of 575 East 137th Street.

7            MR. BRADLEY:  Ms. Fetman, would you please put what

8    has been marked as Government Exhibit 400 on the screen.

9    Q.  Officer Medina, do you recognize this?

10   A.  Yes.

11   Q.  What is this?

12   A.  It's a topographical map of the location.

13   Q.  Is this map a fair and accurate depiction of the location

14   where you observed the defendant's car?

15   A.  Yes, it is.

16   Q.  There's an A and B on this map.  Do you see those, Officer

17   Medina?

18   A.  Yes, I do.

19   Q.  What do those points represent?

20   A.  Letter A indicates the initial observation of Mr. Bell and

21   his vehicle; and letter B indicates the point where he was

22   stopped.

23           MR. BRADLEY:  Your Honor, the government offers

24   Government Exhibit 400.

25           THE COURT:  Received.

1          MS. GIWA:  No objection, your Honor.

2          (Government's Exhibit 400 received in evidence)

3   Q.  Officer Medina, could you describe just the general

4   location of Point A?

5   A.  Location A is East 137th Street; it's right over here, in

6   front of Mill Brook Grocery, Inc.

7   Q.  And can you also just describe the general area of Point B.

8   A.  Point B is on the corner of St. Ann's and 139th Street,

9   where there's a Pioneer Supermarket.

10  Q.  I'd like to turn now to Government Exhibit 304 and 305.

11         MR. BRADLEY:  Ms. Fetman, could you please display

12  these side-by-side on the screen.

13  Q.  Officer Medina, do you recognize these?

14  A.  Yes, I do.

15  Q.  And what are they?

16  A.  The first picture is a screenshot of 575 East 137th Street.

17  The second picture is another screenshot of the corner of 139th

18  and St. Ann's Avenue.

19         MR. BRADLEY:  Your Honor, the government offers

20  exhibits -- Government Exhibits 304 and 305.

21         THE COURT:  Received.

22         (Government's Exhibits 304, 305 received in evidence)

23  Q.  Officer Medina, you testified a few minutes ago that you

24  observed the defendant's car double-parked, I believe, at Point

25  A.  What do you mean by "double-parked"?

1   A.  "Double-parked" means that his vehicle was parked next to

2   other vehicles parked to the side of the sidewalk.

3   Q.  Is double-parking a violation of New York traffic laws?

4   A.  Yes, it is.

5   Q.  You mentioned earlier that the defendant was the driver of

6   the car that you stopped.  Was anyone else in the car or was he

7   alone?

8   A.  He was alone.

9   Q.  After you observed that the defendant's car was

10  double-parked, did you eventually drive past his car?

11  A.  Yes, I did.

12  Q.  You mentioned the smell of marijuana coming from the car, I

13  believe; correct?

14  A.  That's correct.

15  Q.  Would you describe that as a strong or a weak odor?

16  A.  It was a very strong, pungent odor.

17  Q.  Did you form a belief as to the source of that marijuana

18  smell?

19  A.  Yes, I believe the smell came from Mr. Bell's vehicle.

20  Q.  Why do you believe that?

21  A.  As we drove by the vehicle at a slow rate of speed, the

22  strong -- it was strongest from the driver's side window which

23  was open.

24          THE COURT:  The driver's side window of which car?

25          THE WITNESS:  Of the defendant's car.

1   Q.  Was your view obstructed as you drove past the defendant's

2   car?

3   A.  No, it was not.

4   Q.  About how close was your car to the defendant's car as you

5   passed it?

6   A.  A few feet.

7           MS. GIWA:  I'm sorry, I didn't hear the answer.

8           THE WITNESS:  A few feet.

9   Q.  Was the defendant's car still double-parked when you passed

10  it or had it moved?

11  A.  It was still double-parked.

12          MR. BRADLEY:  Ms. Fetman, could you please pull up

13  Government Exhibit 1 on the screen.

14          Your Honor, at this time the government offers

15  Government Exhibit 1, which is a stipulation between the

16  parties regarding certain surveillance videos and body camera

17  videos.  Pursuant to that stipulation, the government also

18  offers Government Exhibits 200, 200-S1, 201, 202, and all other

19  subparts.

20          THE COURT:  Received.

21          (Government's Exhibits 1, 200, 200-S1, 201, 202

22  received in evidence)

23          MR. BRADLEY:  Ms. Fetman could you please pull up

24  paragraph 1 of the stipulation now in evidence as Government

25  Exhibit 1.

1          Just to read this into the record your Honor --

2          THE COURT:  You don't have to read it into the record.

3          MR. BRADLEY:  Understood.

4          Ms. Fetman, could you please pull up Government

5   Exhibit 200A.

6          THE COURT:  These are all parts of what was Exhibits C

7   and D to the motion to suppress, right?

8          MR. BRADLEY:  That's correct, your Honor.

9          THE COURT:  I've already reviewed all of that.  And

10  unless there's objection, I'm going to consider them all

11  received so that we don't have to spend the afternoon laying a

12  foundation for these exhibits.

13         MR. BRADLEY:  Understood, your Honor.

14         MS. GIWA:  No objection, Judge.

15         THE COURT:  Fine.

16  BY MR. BRADLEY:

17  Q.  Officer Medina, before we play the video in Government

18  Exhibit 200A, what are we looking at?

19  A.  You're looking at a screenshot in front of 575 East 137th

20  Street.

21  Q.  Can you just briefly describe what we are about to see on

22  this video?

23  A.  As the video plays, you can observe Mr. Bell's white Honda

24  Accord pull up to the location.  His vehicle is going to park

25  and he's going to remain double-parked with the engine running.

1           THE COURT:  Before we --

2           MS. GIWA:  Objection.

3           THE COURT:  Just a minute.

4           Before we go any further, the image that's on the

5     screen was part of which exhibit in the motion papers?

6           MR. BRADLEY:  I believe that was Defense Exhibit C to

7     the moving papers.

8           THE COURT:  All right.  Some of the material, maybe

9     more than some, on Exhibit C I was unable to open and view.  So

10    anything that's on Exhibit C, as opposed to D, I think you

11    better call attention to specifically here and offer it.

12          So this is what, 200 or --

13          MR. BRADLEY:  This is 200A, your Honor.

14          THE COURT:  All right.  And I'm going to receive that

15    in accordance with what we said before.

16          Go ahead.

17          (Government's Exhibit 200A received in evidence)

18          MR. BRADLEY:  Thank you, your Honor.

19          Ms. Fetman, would you please play the video from the

20    beginning until the 35-second mark.

21          (Video played)

22          MR. BRADLEY:  We're now stopped at the 35-second mark.

23    Q.  Officer Medina, do you recognize the white car that we're

24    seeing on the screen?

25    A.  Yes, I do.

1    Q.   What is that car?

2    A.   That is Mr. Bell's Honda Accord.

3    Q.   Can you describe what the car is doing at this point?

4    A.   It's sitting double-parked.

5    Q.   We're going to continue with the video in a moment.  When

6    it does, would you please point out if your lead car enters the

7    screen?

8    A.   Yes.

9            MR. BRADLEY:  Ms. Fetman, would you please resume the

10   video which is Government Exhibit 200A from the 35-second mark.

11           (Video played)

12   Q.   Officer Medina, we're now seeing a car drive slowly into

13   the frame here.  Do you recognize this car?

14   A.   Yes, this is the vehicle I was traveling in.

15           (Video played)

16           MR. BRADLEY:  And I'll note for the record that we

17   paused at the one-minute-30-second mark.

18           Ms. Fetman, can you publish what is in evidence as

19   Government Exhibit 200-S1.

20   Q.   Officer Medina, can you describe what is shown in this

21   photograph?

22   A.   A screenshot of 575 East 137th Street with Mr. Bell's car

23   parked at the location.

24   Q.   You mentioned earlier, Officer Medina, that upon making

25   these observations, there was a decision to pull over the

1  defendant's car.  Did your car do that?

2  A.  No.  After we made the decision to initiate the car stop,

3  we were radioed into Officer Pando and Officer White indicating

4  our intentions to have the vehicle stopped.

5  Q.  You previously testified, just to clarify, that Officer

6  White and Officer Pando were in the van that was three to four

7  car lengths behind yours; correct?

8  A.  That's correct.

9          MR. BRADLEY:  Ms. Fetman, would you please resume

10 playing the video at Government Exhibit 200A at the

11 one-minute-30-second mark, and pause at the one-minute-55

12 marked.

13 Q.  Officer Medina, as this plays, if you see the van that

14 Officers Pando and White were driving in the video clip, can

15 you please indicate when and where you see it.

16          (Video played)

17 A.  That's the van right there.

18          (Video played)

19 Q.  And as that van is driving by, was the defendant's car

20 still double-parked?

21 A.  Yes, it was.

22          MR. BRADLEY:  I'll note for the record that we're now

23 paused at the one-minute-55 mark.

24          Ms. Fetman, would you please cue up Government Exhibit

25 200B on the screen and hold it.

1    Q.  Officer Medina, before we play this video, what are we

2    looking at here?

3    A.  You're looking at another angle in front of 575 East 137th

4    Street.

5    Q.  And just to clarify, we're going -- excuse me.  We're

6    going -- "another angle," you mean this is the same location,

7    but now looking onto westbound, I believe?

8    A.  That's correct, westbound location.

9    Q.  What are we going to see in this video?

10   A.  You're going to observe my car pass by and stop at the

11   light.  Shows after the black van is going to pull up and make

12   a right onto St. Ann's Avenue, followed by Mr. Bell's car,

13   which is also going to make a right onto St. Ann's Avenue.

14   Q.  So just to clarify, we're going to see the same basic

15   sequence of events, but now looking westbound?

16   A.  That's correct.

17          MR. BRADLEY:  Ms. Fetman, would you please start

18   playing the video beginning at the one-minute-32-second mark.

19   Q.  And Officer Medina, can you please identify your lead car

20   in the van, to the extent they appear on the screen?

21          (Video played)

22   A.  That's the car in which I was traveling in.

23          (Video played)

24   A.  And that is the black van.

25   Q.  What does the lead car do next?

1    A.   The lead car makes a left onto St. Ann's Avenue.

2    Q.   And what is the van going to do?

3    A.   He's going to make a right onto St. Ann's Avenue.

4    Q.   We're now paused at the two-minute-25-second mark.  We're

5    going to continue briefly playing the video in a moment,

6    Officer Medina.  But before we do, can you tell us what we are

7    going to see next in this video?

8    A.   You're going to see Mr. Bell drive off and make a right

9    onto St. Ann's Avenue.

10             MR. BRADLEY:  Ms. Fetman, would you please resume the

11   video from the 2:25 mark, and stop at the two-minute-38-second

12   mark.

13             (Video played)

14   Q.   If you see the defendant's car on the screen, Officer

15   Medina, please point it out.

16   A.   Yeah, the car is driving off now and is making a right onto

17   St. Ann's Avenue.

18   Q.   We're now stopped at the two-minute-38-second mark.

19             MR. BRADLEY:  Ms. Fetman, would you please publish

20   Government Exhibit 400.

21   Q.   Now, Officer Medina, going back to the map that we talked

22   about a few moments ago --

23             THE COURT:  We don't need this map.  I know how the

24   streets are laid out.

25             MR. BRADLEY:  Understood.

Q.  Officer Medina, the car, did the lead car stop the

defendant's car or did the van stop the defendant's car?

A.  The van stopped the defendant's car.

Q.  There is some distance on this map between Point A and

Point B.  Do you know why that is?

A.  The streets between East 137th Street and 138th Street were

not tactically safe to conduct the car stop.

Q.  Why was that?

A.  There was a narrow road.  And due to foot traffic and car

traffic, it was not safe.

Q.  What did you do after your car turned left?

A.  Made a U-turn and went back up onto St. Ann's Avenue.

Q.  Approximately how long did it take for your car to arrive

at the location where Bell's car was stopped?

A.  Not long.

          MR. BRADLEY:  Ms. Fetman, please pull up what's in

evidence as Government Exhibit 201B.

          Excuse me.  Never mind, Ms. Fetman.

Q.  Officer Medina, when you arrived in your lead car at the

scene of the stop, can you tell us what, if anything, happened

next?

A.  I'm sorry.  Repeat the question.

Q.  When you arrived at Point B on the map in your lead car,

what, if anything, happened next?

A.  Our car pulled up to the front end of Mr. Bell's vehicle.

 1   Officers exited, and we approached the vehicle from the

 2   driver's -- I approached the vehicle from the driver's side.

 3   Q.  What, if anything, did you observe when you approached the

 4   defendant's vehicle?

 5   A.  As I approached the vehicle, I glanced inside the car and

 6   observed a marijuana cigarette sitting on a center console.

 7   Q.  How did you know that this was a marijuana cigarette?

 8   A.  Based on my past experiences with marijuana arrests and the

 9   strong odor of marijuana emanating from the vehicle, I believed

10   it was a marijuana cigarette.

11   Q.  Were any other officers on the driver's side of the vehicle

12   at this point?

13   A.  Yes, Officer Pando.

14   Q.  Was Officer Pando the first officer to speak with the

15   defendant?

16   A.  Yes.  As I exited the vehicle, Officer Pando was the first

17   to interact with him and ordered him out the vehicle.

18   Q.  How would you describe the marijuana cigarette that you

19   observed?

20   A.  Small, about a inch and-a-half in length; brown wrapping,

21   and burnt at the end.

22   Q.  Who ordered the defendant out of the car?

23   A.  Officer Pando.

24   Q.  And to confirm, was there anyone else in the car?

25   A.  No, there was no one else.

K1EVBELH                    Medina - direct

1    Q.  What, if anything, were your responsibilities at this

2    point?

3    A.  At that point I had obtained Mr. Bell's driver's license

4    and was conducting a driver's license inquiry on the department

5    cell phone.

6    Q.  What happened next, if anything?

7    A.  As I was doing that, Officer White yelled out, "92."

8    Q.  What is a 92?

9    A.  92 is police radio code for an arrest.

10   Q.  What happened after you heard the police radio code for

11   arrest?

12   A.  Mr. Bell was placed immediately in handcuffs.

13   Q.  Who called out the arrest signal?

14   A.  Officer White.

15   Q.  Where was Officer White standing at this point?

16   A.  He was standing on the front passenger side of the vehicle.

17   Q.  At the time you heard the arrest code, did you know why

18   Officer White had done that?

19   A.  No, I did not.

20   Q.  At the time you approached the defendant's vehicle, were

21   the defendant's car windows open or closed?

22   A.  They were open.

23   Q.  Did you later learn the reason why Officer White had called

24   out the 92 code?

25   A.  Yes, I did.

K1EVBELH                    Medina - direct

1    Q.  And what was that reason?

2    A.  He recovered a firearm inside a book bag on the front

3    passenger seat.

4    Q.  Officer Medina, were you wearing a body camera during this

5    incident?

6    A.  Yes, I was.

7    Q.  When did you turn on your body camera?

8    A.  Shortly after I exited my vehicle.

9    Q.  Was the defendant -- when you turned your body camera on,

10   was the defendant in the car or out of the car?

11   A.  He was already outside of the car.

12   Q.  When are officers supposed to activate their body cameras?

13   A.  They are supposed to be activated immediately upon exiting

14   the vehicle.

15   Q.  Did you follow that practice here?

16   A.  No, I did not.

17   Q.  Why not?

18   A.  We had the cameras for a few months at the time, and I was

19   still become acclimated, and I just simply forgot.

20            MR. BRADLEY:  Ms. Fetman, would you please pull up

21   what's in evidence as Government Exhibit 202C.

22   Q.  Officer Medina, is this your body camera?

23   A.  Yes, it is.

24   Q.  Can you tell us what we're looking at here before we play

25   the video?

A.   You're looking at Officer White looking down holding an

object.  And Mr. Bell is standing outside the vehicle with his

hands on the roof.

Q.   What are we going to see in this video?

A.   You're going to observe Officer White looking at an object,

and shortly after he yells out "92."

Q.   What are you doing at this point?

A.   At this point I'm looking down on my department cell phone

running Mr. Bell's license.

Q.   Is there audio in this file?

A.   For the first 30 seconds, no.

Q.   Why is there not audio in the first 30 seconds?

A.   The way the cameras are set up, for the first 30 seconds

after you activate it, there is no sound.

         MR. BRADLEY:  Ms. Fetman, would you please play the

first 31 seconds of this clip, and then stop.

Q.   And Officer Medina, if you could just describe what is

happening.

         (Video played)

A.   During this time I'm looking down on the department phone,

while Officer White is going through an object.  If you look up

and look inside the vehicle, and look again at the marijuana

cigarette and conduct my business back on the cell phone.

         At this point now, Officer White yells out "92," and

Mr. Bell is placed in mechanical restraints.

1           (Video played)

2    Q.  We're now paused at the 30-second mark.

3           Officer Medina, were you the arresting officer in this

4    case?

5    A.  Yes, I was.

6    Q.  What are your responsibilities as the arresting officer?

7    A.  Processing the prisoner, and vouchering any and all

8    evidence recovered.

9    Q.  What does it mean to voucher a piece of evidence?

10   A.  Vouchering a piece of evidence means giving it a unique

11   series of numbers at which point it can be brought to court at

12   a later date.

13   Q.  What was the arrest evidence that you vouchered in this

14   case?

15   A.  The marijuana cigarette, book bag, a firearm, an extended

16   magazine, and nine live rounds.

17   Q.  Did you seize the marijuana cigarette at the time you saw

18   it in the center console?

19   A.  No, I did not.

20   Q.  Why not?

21   A.  I did not have a narcotics envelope on hand.

22   Q.  Is that procedure for officers to use a narcotics envelope

23   when seizing narcotics evidence?

24   A.  When it goes to be vouchered, yes, it has to be placed in a

25   narcotics envelope.

1    Q.  Did you later seize the marijuana cigarette from the

2    defendant's car?

3    A.  Yes, I did.

4    Q.  Where did you do that?

5    A.  Back at the command.

6    Q.  What did you do upon seizing it?

7    A.  Gaining custody and control of the marijuana cigarette, and

8    place it inside a narcotics envelope.  And then it was

9    vouchered.

10   Q.  Did you submit it for testing?

11   A.  Yes, I did.

12         MR. BRADLEY:  Your Honor, may I approach with

13   Government Exhibit 101?

14         THE COURT:  Yes.

15   Q.  Officer Medina, I've shown you what has been marked as

16   Government Exhibit 101.  It's currently before you at the

17   witness stand.  Do you recognize this?

18   A.  Yes, this is the narcotics envelope containing the

19   marijuana cigarette which I vouchered.

20         THE COURT:  May I see it please.

21   Q.  You mentioned a narcotics testing envelope.  Is that the

22   brown envelope in that bag?

23   A.  That's correct.

24   Q.  Is that your handwriting on the envelope?

25   A.  Yes, it is.

1    MR. BRADLEY:  Your Honor, the government offers

2    Government Exhibit 101.

3            THE COURT:  Received.

4            (Government's Exhibit 101 received in evidence)

5            MR. BRADLEY:  At this time the government also offers

6    Government Exhibit 2 into evidence.  And I ask Ms. Fetman to

7    pull it up on the screen.

8            This is a stipulation between the parties, your Honor,

9    which, in sum and substance, states that the substance in

10   Government Exhibit 101 tested positive for the presence of

11   marijuana.

12           THE COURT:  Received.

13           (Government's Exhibit 2 received in evidence)

14   BY MR. BRADLEY:

15   Q.  Officer Medina, going back to Government Exhibit 101,

16   you'll see there is a substance contained inside a white piece

17   of paper inside that evidence bag.  Is that how the marijuana

18   cigarette appeared to you when you saw it in the defendant's

19   car?

20   A.  No, it was not.

21   Q.  Based on your experience, is it unusual for an object such

22   as a marijuana cigarette to be preserved intact when it is sent

23   to the lab?

24   A.  No, it's not unusual.

25   Q.  It is not unusual?

1  A.  No, it's not unusual.  It was sent to the lab and broken

2  down for chemical testing.

3         MR. BRADLEY:  Your Honor, may I approach with

4  Government Exhibits 102 and 103?

5         THE COURT:  Yes.

6  Q.  Officer Medina, just to clarify, when you testified

7  regarding your understanding of how the police laboratory

8  processes narcotics samples such as marijuana cigarettes, did

9  you say that it was usual or unusual for that sample to come

10  back intact from the lab?

11  A.  I'm sorry, repeat that one more time.

12  Q.  Based on your experience, did you testify that it would

13  have been unusual for that sample to have been returned intact?

14  A.  No.  Again, it's usual -- it's usual when you send it to

15  the lab, it's broken down; so when it returns, it's not going

16  to be as how I found it.

17  Q.  So based on your usual practice, that sample would have

18  been broken down or that cigarette would have been broken down?

19  A.  Yes, that's correct, it would have been broken down.

20  Q.  Now, Officer Medina, in front of you now at the witness

21  stand is what's been marked as Government Exhibits 102 and 103.

22         Do you recognize these?

23  A.  Yes, I do.

24  Q.  And what are they?

25  A.  Exhibit 103 is the book bag recovered from his -- from

1    passenger seat.  And 102 is the firearm extended magazine and

2    nine live rounds contained inside the book bag.

3    Q.  How do you recognize these items?

4    A.  It was my -- the items that I vouchered.

5    Q.  Did you see the backpack at the scene of the arrest?

6    A.  Initially, no.

7    Q.  Initially, no.

8         Do you know who originally took custody of these

9    objects?

10   A.  Officer White.

11   Q.  Did you voucher -- and you mentioned that you vouchered

12   these into the case yourself?

13   A.  Yes, I did.

14        MR. BRADLEY:  Your Honor, the government offers

15   Government Exhibits 102 and 103.

16        THE COURT:  They are received.

17        (Government's Exhibits 102, 103 received in evidence).

18        THE COURT:  Let's move it along, counsellor.

19        MR. BRADLEY:  Yes, your Honor.

20        Your Honor, if I may retrieve the physical evidence.

21        THE COURT:  Look, it seems to me there are three

22   questions:  The marijuana cigarette; whether the backpack was

23   totally closed or not, and if not, whether the magazine was in

24   plain view; and whether the car was double-parked.

25        Isn't that what this all is about?

1          MR. BRADLEY:  Yes, your Honor.  It's whether or not

2     there was a valid basis for the stop.  And that would be based

3     on, for example, as you mentioned --

4          THE COURT:  The double-parking and, alternatively, the

5     smell of marijuana.  I got it.  I've been through all of this

6     stuff.  Let's get to the point.

7          MR. BRADLEY:  Understood.

8          And we are wrapping up, your Honor.  I'm just very

9     quickly showing some photographs that were taken to admit into

10    the record, and then we will be done --

11         THE COURT:  Sometime you ought to listen to Arlo

12    Guthrie's recording of *Alice's Restaurant*.  Nobody here is old

13    enough to know what I'm talking about.

14         MR. BRADLEY:  My apologies, your Honor.

15         MR. MARCUS AMELKIN:  It's a long song.

16         THE COURT:  You should all listen to it.

17    BY MR. BRADLEY:

18    Q.  Officer Medina, there is a manila folder in front of you,

19    and I'm showing you inside that folder what has been marked as

20    Government Exhibits 302, 306, 307, 308, 309, 311, and 312.

21         MR. BRADLEY:  Ms. Fetman, if you could please scroll

22    through those on the screen.

23    Q.  Do you recognize these photographs, Officer Medina?

24    A.  Yes, I do.  The first photograph is a mugshot of Mr. Bell.

25    Q.  And what is Exhibits 306 and 307 showing?

1   A.  306 is the camera shot of the front end of Mr. Bell's

2   vehicle; 307 is a shot of the passenger side inside of the

3   vehicle.

4   Q.  And Government Exhibits 308 and 309, what are they?

5   A.  308 is the backpack which was sitting on the passenger

6   seat.  And 309 is another angle of the same backpack sitting on

7   Mr. Bell's passenger seat.

8   Q.  And 311 and 312, what are they?

9   A.  311 are the contents inside the backpack; and 312 is the

10  firearm which was sitting in the backpack, along with the

11  extended magazine.

12          MR. BRADLEY:  Your Honor, the government offers these

13  exhibits into evidence.

14          THE COURT:  Received.

15          (Government's Exhibits 302, 306, 307, 308, 309, 311,

16  312 received in evidence)

17  Q.  Finally, Officer Medina, during your career with the NYPD,

18  how many car stops, approximately, have you been involved in?

19  A.  Approximately hundreds.

20  Q.  And approximately how many arrests have you been involved

21  in that involve marijuana?

22  A.  Approximately hundreds.

23          MR. BRADLEY:  No further questions, your Honor.

24          THE COURT:  Thank you.

25          Cross-examination.

1          MS. GIWA:  Your Honor, could I approach very quickly?

2          THE COURT:  I'm sorry?

3          MS. GIWA:  May I approach very quickly.

4          MR. MARCUS AMELKIN:  Get some water.

5    CROSS-EXAMINATION

6    BY MS. GIWA:

7    Q.  Good afternoon, Officer Medina.

8    A.  Good afternoon, ma'am.

9    Q.  You testified that you were working in the anticrime unit;

10   correct?

11   A.  That's correct.

12   Q.  And that was conducting arrests for felonious activities?

13   A.  That's correct.

14   Q.  Things like robberies?

15   A.  Yes.

16   Q.  Shootings?

17   A.  Correct.

18   Q.  Serious crimes?

19   A.  Yes.

20   Q.  And your unit typically didn't hand out a lot of summons;

21   is that right?

22   A.  We do handle summonses, but not typically.

23   Q.  You don't typically make traffic arrests or give out

24   traffic tickets?

25   A.  No, not typically.

1    Q.   You don't typically make marijuana arrests?

2    A.   Depends, but we do make marijuana arrests.

3    Q.   On June 28th, you arrived at the precinct, is that right,

4    in the morning?

5    A.   Yes.

6    Q.   And Sergeant Bletcher took roll call?

7    A.   Yes.

8    Q.   Sergeant Bletcher was the supervising sergeant that day,

9    right?

10   A.   That's correct.

11   Q.   And you've worked with him before?

12   A.   Yes.

13   Q.   You've been trained by him?

14   A.   Yes.

15   Q.   And you'd worked with the other officers on this team

16   before?

17   A.   Yes, I have.

18   Q.   Actually for quite some time?

19   A.   Yes, some time.

20   Q.   And you'd all been trained together?

21   A.   Correct.

22   Q.   You've all been supervised by Sergeant Bletcher for a

23   while?

24   A.   Correct.

25   Q.   When you met that morning, did you write out a plan for the

1    day?

2    A.   Our plan was to patrol the high crime areas where there had

3    been a lot of shootings and robberies in the area.

4    Q.   And "patrol" just means drive around?

5    A.   That's correct.

6    Q.   Did you write that plan down anywhere?

7    A.   No.

8    Q.   And you all agreed on a color of the day; is that right?

9    A.   Color of the day is given through the police website.  We

10   don't decide it; it's given to us.

11   Q.   And that day the color was green?

12   A.   Yes.

13   Q.   So I just want to move ahead to when you were in your black

14   Impala.  So this is around 3:50 p.m.; correct?

15   A.   Yes.

16   Q.   And you're sitting in the back seat?

17   A.   Correct.

18   Q.   And it's the end of June?

19   A.   Yes.

20   Q.   So it's hot outside?

21   A.   Yes.

22   Q.   And there are a lot of people on the street?

23   A.   There were people on the street, yes.

24   Q.   And there was traffic moving?

25   A.   That area where we patrol this area, there was some

1    traffic, yes.

2    Q.  You testified that you drove past Mr. Bell's car.  Did you

3    recognize him when you drove by?

4    A.  No, never seen him before.

5    Q.  And he was double-parked on the street?

6    A.  Yes.

7    Q.  He was sitting in the driver's seat?

8    A.  That's correct.

9    Q.  And he was talking to somebody outside the passenger side

10   window?

11   A.  As we drove by, I did not observe anybody whom he was

12   talking to.

13   Q.  You didn't see him talk to anybody at all?

14   A.  Not from my vantage point, no.

15   Q.  For how long would you say you drove by his car?

16   A.  A few seconds.

17   Q.  Seconds.

18         When you drove by his car, you also saw a group of men

19   standing on the sidewalk; correct?

20   A.  There were people standing on the sidewalk.

21   Q.  And some of those men were smoking marijuana?

22   A.  I did not observe them.

23   Q.  When your car drove by Mr. Bell, you were about eight feet

24   away; is that correct?

25   A.  Approximately.

1   Q.  And you just watched the video showing your car drive by

2   Mr. Bell's car, right?

3   A.  Yes.

4   Q.  And you saw that your window was up, right?

5   A.  My window was partially open, but not completely open.

6   Q.  It was most of the way up?

7   A.  Most of the way up, yes.

8   Q.  In the video it looked like it was up?

9   A.  Yes.

10  Q.  And Mr. Bell's driver's side window --

11  A.  Was open.

12  Q.  It was open?

13  A.  Yes.

14  Q.  You testified that as you drove by, you smelled burning

15  marijuana?

16  A.  A strong, pungent odor of marijuana.

17  Q.  But you did not see Mr. Bell smoking marijuana?

18  A.  No, I did not.

19  Q.  And you didn't see any smoke coming out of the window of

20  his car?

21  A.  No I did not.

22  Q.  And you testified that you don't know whether the men on

23  the sidewalk were smoking marijuana?

24  A.  No, I did not observe them.

25  Q.  But you're certain that the smell came from Mr. Bell's car?

K1EVBELH                    Medina - cross

1    A.   As we drove by the vehicle, the odor was strongest and most

2    pungent from the driver's side.

3    Q.   In the video that we watched, if you're driving by

4    Mr. Bell's car, we don't see any smoke coming out of the window

5    of the car; is that correct?

6    A.   That's correct.

7    Q.   But you're certain that the smoke was coming out of his

8    car?

9    A.   I'm certain that the odor was strongest and post pungent

10   from the driver's side of his vehicle, yes.

11   Q.   And this is true even though you were approximately eight

12   feet away?

13   A.   Yes.

14   Q.   And your window was almost all the way up?

15   A.   My window, yes.

16   Q.   When you drove by Mr. Bell, you didn't stop his car right

17   then?

18   A.   No.

19   Q.   Even though his car was stopped?

20   A.   Correct.

21   Q.   In fact, you drove to the light?

22   A.   Yes.

23   Q.   And this was at a four-way intersection?

24   A.   Yes.

25   Q.   And your car turned left?

K1EVBELH                    Medina - cross

1    A.  Correct.

2    Q.  But at that point you didn't know which way Mr. Bell would

3    go?

4    A.  When we radioed to Officers Pando and White, we indicated

5    that he would either make a left, a right, or go straight,

6    which is why we made the left, and Officers White and Pando

7    made the right.

8    Q.  Mr. Bell could have turned left?

9    A.  He could have.

10   Q.  He could have turned right?

11   A.  He could have.

12   Q.  He could have gone straight?

13   A.  That's correct.

14        THE COURT:  And he could have stood on the corner

15   singing *Melancholy Baby*, but let's move this along.

16   Q.  At that point you did not make a decision to stop him right

17   there?

18   A.  No.

19   Q.  Who decided to stop Mr. Bell?

20   A.  Sergeant Bletcher.

21   Q.  And the reason for the stop was because of the strong smell

22   of marijuana?

23   A.  Yes, and the double-parking.

24   Q.  And the double-parked.

25        Do you know what VTL violation that is?

1    A.  I don't recall at this time.

2    Q.  Did you ever issue a ticket for that?

3    A.  Perhaps in the past, but I don't recall.  It's such a long

4    time.

5    Q.  But you're familiar with that section of the traffic law?

6    A.  Vaguely.

7    Q.  And you know that it has an exception for picking up and

8    dropping off passengers; correct?

9    A.  Yes.

10   Q.  You testified that you drove by Mr. Bell's car for a few

11   seconds?

12   A.  Yes.

13   Q.  You don't know whether he picked up or dropped off any

14   passengers?

15   A.  No, I don't, that's correct.  I don't know.

16   Q.  But you still decided that you were going to stop him for

17   that violation?

18   A.  Based on our observation of the vehicle double-parked and

19   the strong odor of marijuana emanating from the vehicle, yes.

20   Q.  And for that stop, the decision was made that five officers

21   were needed?

22   A.  We are a team and we conduct business together, yes.

23   Q.  So all stops?

24   A.  All stops.

25   Q.  You make them as a group of five officers?

1   A.   That's correct.

2   Q.   Whether it's for a traffic ticket --

3   A.   A traffic ticket, for a robbery.  For safety reasons, this

4   is how we travel.

5   Q.   I just want to move ahead to the point at which Mr. Bell's

6   car was stopped on St. Ann's Avenue.

7            So your car pulled in front of Mr. Bell's; is that

8   right?

9   A.   That's correct.

10  Q.   And the van pulled behind him?

11  A.   Yes.  They initiated the stop and had him stop the vehicle

12  shortly after we arrived.  We drove in front of Mr. Bell's

13  vehicle, cutting off his route of travel.

14  Q.   And you went to the driver's side of the car?

15  A.   Yes.

16  Q.   With Officer Pando?

17  A.   Yes.

18  Q.   And Officer White went to the passenger side?

19  A.   Correct.

20  Q.   And Officer Candelario also went to the passenger side?

21  A.   Yes.

22  Q.   And Officer Pando pulled Mr. Bell out of the car?

23  A.   He ordered Mr. Bell out of the car.

24  Q.   And he started asking him questions?

25  A.   Yes.

1    Q.  He asked him what he had bought at the store?

2    A.  I don't recall what exactly he asked him.

3    Q.  Mr. Bell said that he bought a Black & Mild cigar?

4    A.  Okay.

5    Q.  Is that right?

6    A.  I don't know.

7    Q.  Did you ever see a Black & Mild cigar?

8    A.  Upon reviewing the video, I saw a Black & Mild cigar placed

9    on top of the hood of his car.

10   Q.  Did you place it on the hood of the car?

11   A.  No, I did not.

12   Q.  And you testified that as you approached the car, you

13   smelled marijuana?

14   A.  That's correct.

15   Q.  And you also saw a marijuana cigarette?

16   A.  Correct.

17   Q.  And where was that?

18   A.  The center console.

19   Q.  And was the cigarette still burning when you approached?

20   A.  No, it was not.

21   Q.  Was there any smoke coming off it?

22   A.  No.

23   Q.  Was it warm?

24   A.  I didn't touch it at the time, so I wouldn't know.

25   Q.  Officer, do you have Government Exhibit 307 in that binder?

1    A.  Yes, I do.

2    Q.  Can you just tell us what that is?

3    A.  It's an interior shot from the front passenger side of

4    Mr. Bell's vehicle.

5         MR. BRADLEY:  I just note, your Honor, that we

6    published that on the screen.

7    Q.  And does that photograph show the center console of

8    Mr. Bell's car?

9    A.  Yes.

10   Q.  And in the center console there's a gearshift; correct?

11   A.  Right.

12   Q.  And there are two cupholders?

13   A.  Correct.

14   Q.  When you approached the car on the 28th, where in the

15   center console was the marijuana cigarette?

16   A.  The first cupholder closest to the gearshift.

17   Q.  This photograph does not completely reflect the car when

18   you approached it; is that correct?

19   A.  That's correct.

20   Q.  When you approached the car, there was a bottle in one of

21   the cupholders?

22   A.  It was an ashtray.

23   Q.  And there was an ashtray in one of the cupholders?

24   A.  Ashtray in the cupholder, yes.

25        THE COURT:  The same cupholder that had the marijuana

1    cigarette --

2              THE WITNESS:  Yes.

3              THE COURT:  -- or a different one?

4              THE WITNESS:  The same one.

5              THE COURT:  Describe the ashtray for me please.

6              THE WITNESS:  It was black in color, slightly tall.

7    Similar to the one that defense is holding.

8              MS. GIWA:  Your Honor, I'd like to show the witness

9    just as a demonstrative -- may I approach?

10             THE COURT:  Yes.

11             What's the exhibit?

12             MR. MARCUS AMELKIN:  A, your Honor.

13             THE COURT:  Defendant's A.

14   BY MS. GIWA:

15   Q.  Officer Medina, I just handed you an item.  Can you

16   describe what it is?

17   A.  It appears to be an ashtray.

18   Q.  And what color is the ashtray?

19   A.  It's black in color.

20   Q.  Does it have a top that comes off?

21   A.  Yes.

22   Q.  And in that lid is there a hole?

23   A.  Yes, there is.

24   Q.  It's about the size of a cigarette butt?

25   A.  You could say so.

1    Q.  And so one would put a cigarette butt through that hole;

2    correct?

3              THE COURT:  One would or one could?

4              MS. GIWA:  One could.

5    A.  One could, if they chose to, yes.

6    Q.  Is that ashtray similar to the one you saw in Mr. Bell's

7    car on the 28th?

8    A.  It's similar, yes.

9    Q.  What about it is different?

10   A.  I don't have the actual ashtray on hand, so I couldn't 100

11   percent recall, but it's very similar.

12             THE COURT:  Where in relation to the ashtray was the

13   cigarette when you saw it?

14             THE WITNESS:  Sitting on top, your Honor.

15             THE COURT:  Meaning what?

16             THE WITNESS:  Right around here.

17             THE COURT:  So it was in the depression in the top

18   lid?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.

21   BY MS. GIWA:

22   Q.  Officer Medina, you were the arresting officer in this

23   case?

24   A.  Yes.

25   Q.  As you testified, you're responsible for vouchering all of

1    the evidence?

2    A.   Yes.

3    Q.   And you vouchered the marijuana cigarette?

4    A.   Correct.

5    Q.   Did you also voucher the ashtray on which the cigarette was

6    found?

7    A.   No, I did not.

8              MS. GIWA:  Your Honor, at this time I would just ask

9    to move the ashtray into evidence as Defense Exhibit A.

10             THE COURT:  Received.

11             (Defendant's Exhibit A received in evidence)

12             MR. BRADLEY:  I would just note, your Honor, that it's

13   not as Officer Medina testified; it would be -- I guess it's

14   not actually what was in the defendant's car.

15             THE COURT:  I understand that.

16             He said it was very similar.

17             MR. BRADLEY:  Yes.

18   BY MS. GIWA:

19   Q.   Officer Medina, you did not voucher the marijuana cigarette

20   at the scene; correct?

21   A.   No.

22   Q.   Because you didn't have any --

23             THE COURT:  No, it's not correct; or no, you didn't

24   voucher it at the scene?

25             THE WITNESS:  No, I did not voucher it at the scene.

1           THE COURT:  Thank you.

2    Q.   That's because you didn't have any narcotics envelopes at

3    the scene?

4    A.   That's correct.

5    Q.   Did any of the other officers have a narcotics envelope?

6    A.   No.

7    Q.   So you vouchered the marijuana cigarette at the precinct?

8    A.   That's correct.

9    Q.   When you vouchered it, did you turn on your body camera to

10   record that?

11   A.   No, I did not.

12   Q.   At the precinct, did you open the ashtray?

13   A.   I don't recall.

14           THE COURT:  Do you remember whether you removed the

15   ashtray from the vehicle at the precinct?

16           THE WITNESS:  Yes.

17           THE COURT:  Did you?

18           THE WITNESS:  Yes, I did.

19           THE COURT:  Go ahead.

20   Q.   Do you know where that ashtray is now?

21   A.   No, I do not.

22           THE COURT:  Why did you remove the ashtray?

23           THE WITNESS:  Just so I can place it directly into the

24   narcotics envelope with not having to directly touch it.

25           THE COURT:  Got it.  Thank you.

44

1              THE WITNESS:  You're welcome.

2    Q.  Officer Medina, at the precinct there was also an inventory

3    search of all of the items in the car?

4    A.  Correct.

5    Q.  And that's standard NYPD policy?

6    A.  Yes.

7    Q.  And you note down every item that is found in the car?

8    A.  Yes.

9    Q.  Did you review the inventory search?

10   A.  I may have, I don't recall at this time.  I believe the

11   contents were given to another individual.

12   Q.  But this ashtray does not appear in the inventory search;

13   correct?

14   A.  Correct.

15   Q.  Now, I just want to go back to --

16             THE COURT:  Were the wheels individually inventoried?

17             THE WITNESS:  No, your Honor.

18             THE COURT:  How about the seats?

19             THE WITNESS:  No, your Honor.

20             THE COURT:  The windshield wipers?

21             THE WITNESS:  No, your Honor.

22             THE COURT:  The sun visors?

23             THE WITNESS:  No, your Honor.

24             THE COURT:  Let's move it along.

25   BY MS. GIWA:

1    Q.  Officer Medina, had the wheels in the car contained

2    evidence of a crime, they would have shown up in the inventory

3    document; correct?

4    A.  Yes.

5    Q.  I'd like to move to --

6               THE COURT:  Was the car inventoried?

7               That's a serious question.

8               THE WITNESS:  Yes, your Honor.

9               THE COURT:  Okay.  Go ahead.

10   Q.  I'd like to move to the point at which you're standing in

11   front of the car.  Officer White was on the passenger side?

12   A.  Correct.

13   Q.  And he reached into the passenger side of the car?

14   A.  Yes.

15   Q.  And he pulled out the backpack?

16   A.  Yes.

17   Q.  And he started unzipping it?

18   A.  I believe the backpack was already open.

19   Q.  Officer Medina, have you reviewed your body camera marked

20   already as Government Exhibit 202C?

21   A.  Yes.

22   Q.  In the beginning of that video it shows Officer White

23   unzipping the backpack; correct?

24   A.  It shows him handling the backpack; but, again, I was on

25   the department cell phone, so I was not looking to what he was

 1   doing, so I didn't make any observation.

 2               MS. GIWA:  Your Honor, I'd just ask to play Government

 3   Exhibit 202C.

 4               THE COURT:  Maybe we can save some time.

 5               Is the backpack up here?  Where is the backpack?

 6               MR. BRADLEY:  We can bring it up, your Honor.

 7               THE COURT:  Please.  Thank you.

 8               Just viewing the backpack from the outside, I count

 9   one, two, three zippered pockets on the side that would be worn

10   closest to one's back if one were wearing it.  One big zipper

11   around the whole exterior.  And inside the backpack is another

12   zippered container that doesn't actually appear to be part of

13   the backpack.

14               It would be helpful to differentiate here, instead of

15   talking about unzipping the backpack, ignoring the fact that

16   there are about four or five different ways to unzip all or

17   part of it.

18               MS. GIWA:  May I continue, your Honor?

19               THE COURT:  Yes, please do.

20   BY MS. GIWA:

21   Q.  Officer Medina, did you see the backpack on the passenger

22   seat that day?

23   A.  Initially, no.

24   Q.  When is the first time you saw it?

25   A.  After Mr. Bell was placed in handcuffs and Officer White

1    headed to the back of the vehicle, then I observed the

2    backpack.

3    Q.  Okay.  So while you were standing on the driver's side,

4    Officer White never alerted to the presence of a gun?

5    A.  No.

6    Q.  He never alerted to the presence of ammunition?

7    A.  No.

8    Q.  Officer Candelario, he never alerted to the presence of a

9    gun?

10   A.  No.

11   Q.  He never alerted to the presence of ammunition?

12   A.  No.

13            THE COURT:  At what point in relation to when you

14   first saw the backpack did Officer White, I believe it was,

15   call code 92?

16            THE WITNESS:  It was after he called 92.

17            THE COURT:  How much after?

18            THE WITNESS:  Almost immediately after.

19            THE COURT:  And in relation to when you saw Officer

20   White handle the backpack, when did he call code 92?

21            THE WITNESS:  Again, I was looking down at the phone,

22   so I was not observing him handling the backpack.  Only when he

23   called 92 did I look up and then observed that he was looking

24   to the rear of the vehicle with the backpack in hand.

25            THE COURT:  Okay.  Thank you.

1          THE WITNESS:  You're welcome.

2          MS. GIWA:  Your Honor, this is all captured on the

3   body camera.  And I would again ask just to watch Government

4   Exhibit 202C, which is Officer Medina's body camera.

5          THE COURT:  Okay.

6          (Video played)

7          THE COURT:  Just so you understand, what I take from

8   this is that Officer White had the backpack on the right front

9   side of the car.  He was obviously devoting attention to it; he

10  had it in his hands.  What exactly he was doing with it is not

11  visible from the video to me.

12         And then he turns to the left, says something, which,

13  of course, we have no audio of, and then takes the backpack and

14  walks to the rear of the car.  If I'm missing something, you

15  should alert me to it, because that's -- that's why I'm telling

16  you.

17         MS. GIWA:  Your Honor, I'd just like to play the first

18  few seconds of the video again.

19         THE COURT:  Sure.

20         MS. GIWA:  Maybe the first 10 or 12 seconds.

21         (Video played)

22         MS. GIWA:  Can we play just a couple more seconds.

23         (Video played)

24         MS. GIWA:  Thank you.

25         THE COURT:  Look, obviously he's looking at stuff.

 1    He's got this in his hands.  But what exactly he's looking at

 2    and whether it was open when he started or not, I can't tell

 3    from this video.

 4    BY MS. GIWA:

 5    Q.  Officer Medina, you saw in the video Officer White pull out

 6    the backpack?

 7    A.  Yes.

 8    Q.  And you saw him unzip what looks like the zipper of the

 9    main compartment; correct?

10    A.  It looks like he's handling the backpack.

11    Q.  And he put his hand into the backpack?

12            THE COURT:  That's two different questions.

13            When you look at this video, in your opinion, are you

14    seeing him unzip the biggest zipper on the backpack or not?

15            THE WITNESS:  No, your Honor.

16    Q.  You see him unzip the backpack; correct?

17            THE COURT:  There you go again.  That's not helpful.

18    Q.  You saw him reach his hand into the backpack?

19    A.  Appears so.

20    Q.  But you, yourself, did not see the backpack at that time?

21    A.  No.  Again, I was looking down at the time.

22    Q.  And you --

23            THE COURT:  Look, Ms. Giwa, the whole point of my

24    pointing out that there are at least four zippers on this

25    backpack and several pockets accessible from the outside that

1    are individually zippable, makes questions about unzipping the

2    backpack singularly unhelpful because it doesn't tell me

3    whether you mean and whether the witness's responses go to the

4    question did he open the interior of the backpack or did he

5    open one of the little side pockets or was there a side pocket

6    open when he picked it up.

7              In the act of picking it up, if there was something in

8    plain view when it was lying on the seat, did it slide by force

9    of gravity into the open pocket from which it was protruding

10   when he picked it up?  He reaches in -- just a hypothesis --

11   into that, finds a magazine, and then starts opening the rest

12   of the backpack.  I can't tell that from this video.

13             MS. GIWA:  Hopefully, Officer White's video will be

14   more instructive.

15             THE COURT:  Maybe.

16   BY MS. GIWA:

17   Q.  Officer Medina, you actually didn't see the gun at all at

18   the scene that day?

19   A.  That's correct.

20   Q.  You didn't see the gun until you got back to the precinct?

21   A.  Yes.

22   Q.  Officer Medina, as we've gone over, you were the arresting

23   officer?

24   A.  Yes.

25   Q.  And so you observed Mr. Bell?

1   A.  Yes.

2   Q.  And you spoke to him?

3   A.  At the scene, no.

4   Q.  You spoke to him later at the precinct?

5   A.  Pedigree information, yes.

6   Q.  Because you had to fill out paperwork?

7   A.  Correct.

8   Q.  And Mr. Bell answered all of your questions?

9   A.  Yes.

10  Q.  He was cooperative?

11          THE COURT:  This has nothing to do with anything.

12          MS. GIWA:  Your Honor, I think it is relevant.  It's

13  subject to connection.  I just ask for leeway to ask a few more

14  questions about this.

15          THE COURT:  What's it relevant to?

16          MS. GIWA:  Mr. Bell's condition at the time of his

17  arrest.

18          THE COURT:  His condition?  I've just watched all

19  these videos; I've seen it live.  Move on, please.

20  BY MS. GIWA:

21  Q.  Officer Medina, you did not think that Mr. Bell was

22  intoxicated; correct?

23  A.  At this time, no.

24  Q.  And you did not think that he had used any drugs?

25  A.  I cannot make that determination at the time.

1    Q.  But you filled out an arrest report in this case; correct?

2    A.  Correct.

3    Q.  And on the arrest report, it says drugs used, and you wrote

4    "none"; correct?

5    A.  Correct.

6    Q.  Officer Medina, you had your memo book on you on the 28th?

7    A.  Correct.

8    Q.  But you didn't take notes in real time?

9    A.  No.

10   Q.  You waited until you had spoken to the other officers?

11   A.  When we returned back to the command, yes.

12   Q.  And you debriefed the case supervisor?

13   A.  With my sergeant, yes.

14   Q.  And then you and the other members on your team filled out

15   your memo book together; correct?

16   A.  Right.

17   Q.  And as we know, you were wearing a body camera on the 28th?

18   A.  Yes.

19   Q.  And you've been trained on how to use them?

20   A.  Yes.

21   Q.  And you've read the patrol guide sections on body cameras?

22   A.  Yes.

23   Q.  And you said you'd only recently received it.  When was

24   that?

25   A.  The exact date I don't recall.  I know we were still

K1EVBELH                    Medina - cross

1   becoming acclimated, as I said before.  So it was in my error;

2   I just simply forgot.

3   Q.  But you had been trained on how to use it?

4   A.  Yes.

5   Q.  When you used -- when you wear a body camera, you have to

6   turn it on yourself?

7   A.  Yes.

8   Q.  And you testified that the sound turns on 30 seconds later?

9   A.  Yes.

10  Q.  Is there a way to turn on the sound when you turn the body

11  camera on?

12  A.  No.

13  Q.  So you know that it is mandatory to turn your body camera

14  on before any vehicle stop?

15  A.  Yes.

16  Q.  But you did not turn your camera on right away?

17  A.  No.

18  Q.  You waited until Mr. Bell was already out of the car?

19  A.  Yes.  When I received his driver's license and was

20  conducting the search on my department phone, I had noticed my

21  body camera and realized I hadn't turned it on, at which point

22  I did turn it on.

23  Q.  And are you aware that none of the other officers turned

24  their body cameras on --

25              THE COURT:  What difference --

1   Q.  -- when the police activity began?

2              THE COURT:  What difference does his awareness make?

3              MS. GIWA:  I'm just asking, Judge.

4              THE COURT:  I know you're just asking.  And if I sit

5   here so that any question any lawyer thinks of that I'm just

6   asking is appropriate, I could be here for the rest of the

7   month.  We're not going to do it.

8              MS. GIWA:  Your Honor, there are five officers

9   involved in this arrest.

10             THE COURT:  I understand this.  I've read your papers.

11             MS. GIWA:  And it seems more than just a coincidence

12  that none of them turned their body cameras on.

13             THE COURT:  You have some evidence?

14             MS. GIWA:  That's why I'm asking --

15             THE COURT:  You want to ask him whether they had a

16  meeting and decided nobody turn body cameras on?  Ask away.

17  BY MS. GIWA:

18  Q.  Are you aware that none of the other officers turned their

19  video cameras on until after the police activity --

20             THE COURT:  Sustained.

21             MR. BRADLEY:  Your Honor, I object.

22  Q.  So your body camera footage doesn't show how you got out of

23  the car; correct?

24  A.  No.

25             THE COURT:  Look --

1   Q.  It doesn't show Mr. Bell getting out of the --

2            THE COURT:  Move to another subject, Ms. Giwa, or sit

3   down please.

4   Q.  I just want to ask finally, the body camera does not show a

5   marijuana cigarette or ammunition; correct?

6   A.  No.

7            THE COURT:  Not correct or it doesn't show it?

8            THE WITNESS:  It didn't show it.

9            MS. GIWA:  Your Honor, I just need one second to

10  confer with my client.

11           (Counsel and defendant conferred)

12           MS. GIWA:  Nothing further, your Honor.

13           THE COURT:  Okay.  Thank you.

14           Anything else?

15           MR. BRADLEY:  Just two questions, your Honor.

16           THE COURT:  All right.

17  REDIRECT EXAMINATION

18  BY MR. BRADLEY:

19  Q.  Officer Medina, when you previously testified regarding

20  your observations of the defendant's car on East 137th Street,

21  was the front passenger window open or closed?

22  A.  The front passenger window was open.

23  Q.  Of which car was that?

24  A.  Of lead car, my vehicle.

25  Q.  Of your vehicle?

1   A.   Yes.

2   Q.   And earlier Ms. Giwa asked you some questions about your

3   body camera video and specifically what you were able to

4   observe regarding Officer White's -- Officer White and the

5   backpack.

6        Were you able to tell one way or the other what

7   compartment -- whether or not any compartments were being

8   opened in that video?

9   A.   No, no, my view was obstructed.

10            MR. BRADLEY:  No further questions.

11            THE COURT:  All right.  Thank you.

12            Ms. Giwa, any recross?

13  RECROSS EXAMINATION

14  BY MS. GIWA:

15  Q.   Just one question, Officer Medina.

16            You were not sitting in the front passenger seat;

17  correct?

18  A.   No, the rear passenger seat.

19            MS. GIWA:  Nothing further.

20            THE COURT:  Thank you.  You are excused, Officer.

21            THE WITNESS:  Thank you, your Honor.

22            (Witness excused)

23            THE COURT:  Next witness.

24            MR. BRADLEY:  Your Honor, the government calls Officer

25  Michael Pando to the stand.

1          THE COURT:  Let's get right to the point with this.

2          MR. BRADLEY:  Yes, your Honor.  And your Honor, I

3   should just note that we anticipate that the direct of these

4   next two witnesses will be at least half as long.

5          THE COURT:  Boy, that's reassuring.

6   MICHAEL PANDO,

7        called as a witness by the Government,

8        having been duly sworn, testified as follows:

9          THE COURT:  Proceed.

10  DIRECT EXAMINATION

11  BY MR. BRADLEY:

12  Q.  Officer Pando, where do you work?

13  A.  NYPD, South Bronx PSA-7.

14  Q.  I take it your title is officer?

15  A.  Yes, sir.

16  Q.  Is PSA-7 your current station?

17  A.  Yes, sir.

18  Q.  Officer Pando, approximately how many car stops have you

19  investigated during your career with the NYPD?

20  A.  I would say hundreds.

21  Q.  And how long have you been with the NYPD?

22  A.  Eight years now.

23  Q.  Approximately during that eight-year period, how many

24  investigations and arrests have you participated in involving

25  marijuana?

1    A.  Several.

2    Q.  Can you please describe any police training you received

3    regarding marijuana and other controlled substances?

4    A.  I have gone to SNEU training for the recognition of

5    narcotics, marijuana, and various other narcotics as well, and

6    marijuana field testing.

7    Q.  Directing your attention to June 28th, 2019, were you on

8    duty that day?

9    A.  Yes, sir.

10   Q.  Were other officers involved in your patrol at this time?

11   A.  Yes, sir.

12   Q.  Who Were they?

13   A.  Sergeant Bletcher, Officer Candelario.

14          THE COURT:  There is no dispute about any of this.

15          Move on.

16          MR. BRADLEY:  Yes, your Honor.

17   BY MR. BRADLEY:

18   Q.  Officer Pando, which car were you in during this patrol?

19   A.  I was in the second vehicle.

20   Q.  Second vehicle.  Which car was that?

21   A.  The unmarked black van.

22   Q.  Black van.  Who else was in your car?

23   A.  My partner, Officer White.

24   Q.  Were you the driver of the car?

25   A.  Yes, sir, I was.

1    Q.  Was your vehicle traveling in front of or behind the second

2    car?

3    A.  I was the second car.  I was behind.

4    Q.  I'd like to direct your attention to approximately 3:55

5    p.m. on June 28th, 2019.  Were you involved in a car stop

6    around this time?

7    A.  Yes, sir, I was.

8    Q.  Can you please describe the make and model of the car that

9    was stopped?

10   A.  It was a white Honda Accord.

11   Q.  Who was the driver of that car?

12   A.  Defendant Demetrues Bell.

13   Q.  Is that person sitting in court today?

14   A.  Yes, sir, he is.

15             THE COURT:  Identifying the defendant.

16             Let's move it.

17   Q.  Which of the two patrol cars stopped the defendant's car on

18   that day?

19   A.  I did.

20   Q.  In the van?

21   A.  Yes, sir.

22   Q.  Why did you stop the car?

23   A.  I was instructed to by my sergeant.

24   Q.  And where were you driving when you got the radio call?

25   A.  I was on 137th Street, right before St. Ann's Avenue.

1    Q.  Did you see the defendant's car at this point?

2    A.  Yes, sir.  It was double-parked off to my right in front of

3    a grocery store.

4    Q.  Would you please describe what happened next after you

5    first saw the defendant's car.

6    A.  The lead vehicle had passed, I passed him, and I made a

7    right onto St. Ann's Avenue, in which I waited on the right

8    side.  The defendant's vehicle made a right-hand turn onto St.

9    Ann's as well, but he didn't use his signal to complete that

10   right-hand turn.

11   Q.  How were you able to see that the defendant's car turned

12   without signaling?

13   A.  I was using my rearview mirrors and my side view as well.

14   Q.  And approximately where was your van when you observed the

15   defendant's car turning onto St. Ann's without signaling?

16   A.  I was on St. Ann's Avenue.

17   Q.  Is turning without signaling a traffic violation in New

18   York?

19   A.  Yes, sir, it is.

20   Q.  Where was the defendant's car stopped?

21   A.  It was stopped approximately on the corner of 139th Street

22   and St. Ann's Avenue.

23   Q.  Did you communicate with the defendant's car prior to the

24   stop?

25   A.  Not prior to the stop.  After the stop.

1    Q.  After the stop.

2            And what did you communicate to the defendant?

3    A.  I had asked the defendant to lower all four windows and

4    turn off his engine.

5    Q.  How did you do this?

6    A.  We have a loudspeaker the van is equipped with to

7    communicate.

8    Q.  Did the lead car later arrive on the scene?

9    A.  Yes, sir.

10   Q.  And approximately when did it arrive?

11   A.  Couple seconds later.

12   Q.  Could you please describe what happened after you pulled

13   the defendant's car over?

14   A.  Yes, sir.

15           The lead car parked in front of the defendant's car.

16   After it did that, I exited my vehicle and proceeded to

17   approach the driver's side window.

18   Q.  Were you the first officer to speak with the defendant?

19   A.  Yes, sir, I was.

20   Q.  Was anyone else in the car?

21   A.  No, sir.

22   Q.  You testified that your partner, Officer White, was also in

23   the van.  Where was he at the time he approached the

24   defendant's car?

25   A.  By the passenger side window.

1    Q.   About how close were you to the driver's side of the car

2    when you approached?

3    A.   I would say about a foot or two.

4    Q.   Were the defendant's windows -- car windows open or closed

5    at this point?

6    A.   They were open.

7    Q.   Did you make any observations at this point in the stop?

8    A.   Yes, sir?

9    Q.   And what were they?

10   A.   I had asked the defendant to provide me with his license

11   and registration.  At that point when he was retrieving those

12   items, I was able to see inside the center console that there

13   was a marijuana cigarette in the small bay there, the little

14   ashtray there.

15   Q.   What do you mean by "a marijuana cigarette"?

16   A.   Marijuana rolled up in kind of like a cigar wrapping.

17   Q.   How did -- did it appear burned?

18   A.   Yes, sir, it did.

19   Q.   How did you know this was a marijuana cigarette as opposed

20   to something else?

21   A.   Just my training and experience, and the odor emanating

22   from the vehicle as well.

23   Q.   How strong of a smell was this?

24   A.   It was pretty -- pretty strong.

25   Q.   What happened after you made this observation?

1   A.   I then asked the defendant to step out the vehicle.

2   Q.   And specifically, to clarify, it was you that ordered the

3   defendant to step out of the vehicle?

4   A.   Yes, sir.

5   Q.   Why did you do this?

6   A.   Because of the marijuana cigarette and the odor emanating

7   from the vehicle as well.

8   Q.   What happened next?

9   A.   I asked him to step out.  For my safety, we -- I conducted

10  a safety frisk of his waistband and on his person.  After that

11  was over, I proceeded to walk him to the back of the vehicle,

12  in which at that point in time my partner, Officer White,

13  signaled to us our arrest code, which is 1092 for an arrest.

14  Q.   At the time you heard it, did you know why Officer White

15  had signaled out an arrest code?

16  A.   No, sir.

17  Q.   Did you later learn the reason?

18  A.   Yes, sir.

19  Q.   And what was that reason?

20  A.   There was a firearm in the book bag that was on the front

21  passenger seat, and a magazine that was loaded as well.

22  Q.   Officer Pando, you testified that you observed a marijuana

23  cigarette inside the car on the center console.  Did you

24  observe anything else inside the vehicle?

25  A.   No, not at that point.

1   Q.  Not at that point.

2          MR. BRADLEY:  Ms. Fetman, would you please publish

3   Government Exhibit 308.

4   Q.  Officer Pando I'm showing you what is in evidence as

5   Government Exhibit 308.  Do you recognize this?

6   A.  Yes, sir.

7   Q.  What is this?

8   A.  This is the book bag that the firearm and magazine was

9   recovered from that was sitting on the front passenger side

10  seat.

11  Q.  Officer Pando, were you wearing a body camera during this

12  incident?

13  A.  Yes, sir, I was.

14  Q.  When did you turn on your body camera?

15  A.  Approximately -- I believe I was walking him to the back of

16  the vehicle at some point.

17  Q.  When are officers supposed to activate their body cameras?

18  A.  On the exit of my vehicle.

19  Q.  Did you follow that practice here?

20  A.  At that time I did not.

21  Q.  Why not?

22  A.  The cameras were still pretty new to us; we were still

23  getting used to them and getting used to using them as well.

24  Q.  Officer Pando, did you seize the marijuana cigarette when

25  you saw it?

1   A.  No, I did not.

2   Q.  Why not?

3   A.  I didn't want it to get damaged.  I guess for safekeeping I

4   left it where it was until we could recover it safely.

5   Q.  Did there come a time in which you learned that that

6   marijuana cigarette was vouchered in this case?

7   A.  Yes, sir.

8           MR. BRADLEY:  Your Honor, no further questions.

9           THE COURT:  All right.  Thank you.

10          Cross-examination.

11  CROSS-EXAMINATION

12  BY MS. GIWA:

13  Q.  Good afternoon, Officer Pando.

14  A.  Good afternoon, ma'am.

15  Q.  Officer Pando, when you initiated the stop, you testified

16  that you directed Mr. Bell to roll all of his windows down?

17  A.  Yes.

18  Q.  Which windows were up?

19  A.  I don't recall.

20  Q.  So you don't know which windows he rolled down?

21  A.  No.

22  Q.  You were in the van with Officer White?

23  A.  Yes, ma'am.

24  Q.  And he's your partner?

25  A.  Yes, ma'am.

1    Q.  And you've worked together for quite some time?

2    A.  Yes, ma'am.

3    Q.  When you drove by Mr. Bell's car when he was double-parked,

4    did you recognize Mr. Bell?

5    A.  No, ma'am.

6    Q.  And you saw him talking to some people through the

7    passenger side window?

8    A.  I don't recall.

9    Q.  You didn't see him talking to anybody?

10   A.  I don't recall him talking to anyone, no.

11   Q.  Did you see people standing on the sidewalk next to his

12   car?

13   A.  I don't recall.

14   Q.  And when you drove by, you couldn't keep your eyes on

15   Mr. Bell the entire time, right?

16   A.  Yes.

17   Q.  And that's because --

18   A.  I was driving.

19   Q.  -- you were driving.

20           But you testified that you smelled marijuana as you

21   drove by?

22   A.  I didn't say as I drove by.  I said when I was approaching

23   the vehicle, I smelled the marijuana.

24   Q.  So when is the first time that you smell marijuana?

25   A.  From what I can remember, it was when I was approaching the

1    vehicle.

2    Q.  When you're approaching the vehicle where?

3    A.  By 139th Street and St. Ann's.

4    Q.  And before that, you did not smell any marijuana?

5    A.  I don't recall.

6    Q.  Why did you stop Mr. Bell's car?

7    A.  I was told to by my sergeant.

8    Q.  Were you given a reason?

9    A.  Not at that point, no.

10   Q.  And so after you saw Mr. Bell double-parked, you turned

11   right?

12   A.  Correct.

13   Q.  And you waited on the corner?

14   A.  Yes.

15   Q.  And at that point you had already received the message from

16   Sergeant Bletcher?

17   A.  Correct.

18   Q.  But you didn't know why you were making the stop?

19   A.  No, ma'am.

20   Q.  When you pulled Mr. Bell out of the car, you started asking

21   him questions?

22   A.  I don't recall me asking him questions.  I remember me

23   asking him to step out of the vehicle and conducting my safety

24   frisk.

25   Q.  You didn't ask him what he had bought at the store?

1  A.  I don't remember ever asking him that.

2  Q.  Did you ask him about the Black & Mild in the car?

3  A.  I don't recall.

4  Q.  Do you remember seeing a Black & Mild?

5  A.  I don't recall.

6  Q.  Do you remember taking the Black & Mild cigar out of the

7  car?

8  A.  No, I don't.

9  Q.  Do you remember putting it on top of -- on the roof of the

10 car?

11 A.  I -- I don't recall.

12 Q.  Do you remember taking Mr. Bell's wallet off his person?

13 A.  I may have.  I'm not sure.

14 Q.  Do you remember putting his wallet on the roof of the car?

15 A.  I remember the wallet being on top of the roof of the car,

16 I do.

17 Q.  And you also do remember seeing a marijuana cigarette in

18 the car?

19 A.  Yes.

20 Q.  Where in the car was the marijuana cigarette?

21 A.  The center console area.

22 Q.  The center console has a gearshift, right?

23 A.  Correct.

24 Q.  And it has two cupholders?

25 A.  Correct.

K1EVBELH                    Pando - cross

1    Q.   And in one of the cupholders there was a bottle?

2    A.   I don't recall that.

3    Q.   In the other cupholder there was an ashtray?

4    A.   I don't recall that.

5    Q.   Officer Pando, I'd like you to take a look at government --

6    I'm sorry, Defense Exhibit A, the ashtray next to you.

7    A.   Okay.

8    Q.   Does taking a look at that refresh your recollection about

9    the ashtray that was in the car when you approached it?

10   A.   No, ma'am.

11   Q.   So where in the center console was the marijuana cigarette?

12   A.   From what I can remember, there was cupholders, the

13   shifter, and a small area right past the shifter where I

14   believe the marijuana cigarette was at.  That's where I

15   remember it being.

16   Q.   Give me one second.

17        Officer Pando, could you take a look at Government

18   Exhibit 307.  It should also be published, please, and on the

19   screen in front of you.

20        MR. BRADLEY:  Do you want us to put it on the screen?

21        MS. GIWA:  Please.

22        MR. BRADLEY:  Your Honor, let the record reflect that

23   Ms. Fetman is publishing Government Exhibit 307 on the screen.

24        MS. GIWA:  Your Honor, if it's easier, can I show the

25   witness a physical copy?

K1EVBELH                    Pando - cross

1          THE COURT:  I'm sorry, I can't hear you.

2          MS. GIWA:  Should I show the witness a physical copy?

3          THE COURT:  No, it's on the screen.

4          MS. GIWA:  Great.

5     BY MS. GIWA:

6     Q.  Officer Pando, you just testified that there's a gearshift

7     in the center console; correct?

8     A.  Yes, ma'am.

9     Q.  And two cupholders?

10    A.  Correct.

11    Q.  And there's an area in front of the gearshift?

12    A.  Yes, ma'am.

13    Q.  Is that where the marijuana cigarette was?

14    A.  Yes, ma'am.

15    Q.  So are you referring to the space between the gearshift and

16    the front windshield, to the area closer to the windshield?

17    A.  Just past the gearshift there's like a cubbyhole ashtray

18    area right there, that's where I'm referring to.

19    Q.  And so where was the marijuana cigarette?

20    A.  Where I just described, right past the gearshift is kind of

21    a cubbyhole and ashtray area, that's where it was recovered

22    from.

23    Q.  So between the gearshift and the cupholder or between the

24    gearshift and maybe the radio?

25    A.  Right past the gearshift there's a cubbyhole area and

1   there's an ashtray area.  Right directly behind it.

2   Q.  So not in the area between the gearshift and the cupholder?

3   A.  No.

4   Q.  On the other side of the gearshift?

5   A.  Yes.

6   Q.  Okay.  Thank you.

7           When you stopped Mr. Bell, you didn't ask him about

8   marijuana?

9   A.  No, not that I can recall.

10  Q.  When you pulled him out of the car, you didn't ask him

11  about marijuana?

12  A.  Not that I can recall.

13  Q.  You didn't alert any of the other officers to the presence

14  of marijuana?

15  A.  I don't recall if I said anything at that point or if I

16  just asked him to step out the vehicle.

17  Q.  And you testified that you did not take the marijuana

18  cigarette out of the car?

19  A.  No, I didn't.

20  Q.  And you didn't field test it on the scene?

21  A.  No, ma'am.

22  Q.  When you approached the car, all the windows were down?

23  A.  Yes, ma'am.

24  Q.  And you saw a backpack?

25  A.  At that point I wasn't paying attention to the backpack.

1   From the angle where I was, I really couldn't see the backpack.

2   Q.  So you didn't see anything sticking out of the backpack?

3   A.  Myself, no.

4   Q.  Did you see Officer White take the backpack out of the car?

5   A.  No, I didn't see him recover the backpack.  I was dealing

6   with the defendant on my side of the vehicle.

7   Q.  So you didn't see him open the backpack?

8   A.  No.

9   Q.  And Officer White never alerted you to the presence of a

10  gun?

11  A.  Not till after the defendant was placed under arrest.

12  Q.  Prior to the arrest, Officer White never alerted you to the

13  presence of ammunition?

14  A.  No.

15  Q.  And you didn't see it until Officer White had opened the

16  bag?

17  A.  I actually didn't physically see the firearm until we got

18  back to the precinct.

19  Q.  You testified that you were wearing a body camera when you

20  conducted this arrest.  When had you received your body camera?

21  A.  Sometime end of March/April.

22  Q.  And the arrest -- this arrest was made end of June;

23  correct?

24  A.  Yes.

25  Q.  And so you'd received training on how to use body cameras?

1   A.   Yes.

2   Q.   And you are familiar with the patrol guide section on body

3   cameras?

4   A.   Yes.

5   Q.   And you know that it is mandatory to turn your body camera

6   on before you engage in police activity; correct?

7   A.   Yes.

8   Q.   And before any vehicle stop?

9   A.   Yes.

10  Q.   But here, you waited until Mr. Bell was out of the car

11  before turning on your body camera?

12  A.   As I stated before, it was still fairly new to us and I was

13  still getting used to it.

14  Q.   So you waited until Mr. Bell was out of the car before

15  turning on your body camera?

16  A.   Yes.

17  Q.   Okay.  And so your body camera footage does not show any

18  marijuana?

19  A.   I reviewed the body camera footage, but I don't recall if

20  it does or not.

21  Q.   Okay.  Does your body camera footage show any ammunition

22  sticking out of the backpack?

23  A.   I don't believe so.

24          MS. GIWA:  Your Honor, just one minute.

25          (Counsel conferred)

```
1            (Counsel and defendant conferred)

2            MS. GIWA:  Nothing further, your Honor.

3            THE COURT:  Thank you.

4            MR. BRADLEY:  Nothing further from the government.

5            THE COURT:  Thank you, Officer.  You are excused.

6            (Witness excused)

7            THE COURT:  Next witness.

8            MR. BRADLEY:  Your Honor, the government calls its

9    third and final witness, Officer Yahkeem White.

10           MR. MARCUS AMELKIN:  Your Honor, while they are

11   grabbing him, can I run to the rest room real quick?

12           THE COURT:  Yes.

13           MR. MARCUS AMELKIN:  Thank you.

14           MR. BRADLEY:  Your Honor, before bringing the witness

15   in, I just want to raise one point.

16           I'm sorry, I know you're going to the rest room.

17           But, your Honor, just briefly.  The government filed a

18   motion in limine regarding a motion to preclude

19   cross-examination of Officer White regarding two substantiated

20   CCRB complaints.  For the reasons explained in that motion in

21   limine, the government respectfully asks that the Court

22   preclude the defense from cross-examining Officer White on

23   those topics for the purposes of the suppression hearing as

24   well.

25           THE COURT:  I'll take that if, as, and when it arises.
```

1           MR. BRADLEY:  Thank you.

2    YAHKEEM WHITE,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5           THE COURT:  Proceed please.

6           MS. GIWA:  Your Honor, can we just wait a minute for

7    Mr. Marcus Amelkin to get back?

8           THE COURT:  All right.  I thought you were going to

9    take care of this, but we'll wait.

10          (Pause)

11          THE COURT:  Okay.  Let's go.

12   DIRECT EXAMINATION

13   BY MR. BRADLEY:

14   Q.  Good afternoon, sir.  Where do you work?

15   A.  NYPD.

16   Q.  What is your current title there?

17   A.  Police officer.

18   Q.  How long have you been with the NYPD?

19   A.  Roughly ten years.

20   Q.  What is your current station?

21   A.  PSA-7.

22   Q.  Officer White, approximately how many car stops have you

23   investigated during your career at NYPD?

24   A.  Hundreds.

25   Q.  Approximately how many investigations and arrests have you

1    participated in involving firearms?

2    A.   Around 50.

3    Q.   What kind of police training have you received regarding

4    firearms and their parts?

5    A.   Handling the firearms, identify firearms, things of that

6    nature.

7    Q.   Directing your attention to June 28th, 2019, were you on

8    duty that day?

9    A.   Yes, I was.

10   Q.   Was that anticrime patrol?

11   A.   Yes, it was.

12   Q.   And what locations were you patrolling that day?

13   A.   The Mill Brook Houses.

14   Q.   Were you and the other officers in uniform or in plain

15   clothes?

16   A.   Plain clothes.

17   Q.   Was that patrol by vehicle?

18   A.   Yes, it was.

19   Q.   How many vehicles were involved?

20   A.   Two vehicles.

21   Q.   Which of those two vehicles were you in?

22   A.   The secondary vehicle.

23   Q.   What was the -- what kind of car was the secondary vehicle?

24   A.   A van, unmarked van.

25   Q.   Who else was in the car?

1   A.  Officer Pando.

2   Q.  Who was driving?

3   A.  Officer Pando.

4   Q.  Where were you sitting in the van?

5   A.  Passenger side.

6   Q.  Was your van traveling in front of or behind the other car,

7   the patrol?

8   A.  Behind the other car.

9   Q.  And approximately how close were those two cars traveling?

10  A.  Three to four car lengths apart.

11  Q.  Officer White, I'd like to direct your attention to

12  approximately 3:55 p.m. on June 28, 2019.

13          Were you involved in a car stop around this time?

14  A.  Yes, I was.

15  Q.  Can you please describe the make and model of the car that

16  was stopped?

17  A.  Honda Accord.

18  Q.  Who was the driver of that car?

19  A.  Demetrues Bell.

20  Q.  Is that person sitting in court today?

21  A.  Yes, he is.

22  Q.  Would you please identify him and describe an article of

23  clothing he is wearing?

24  A.  If I could stand up.

25  Q.  Yes.

K1EVBELH                      White - direct

1    A.  The gentleman sitting straight across from me, the navy

2    blue shirt.

3              MR. BRADLEY:  Your Honor, let the record reflect that

4    the witness has identified the defendant sitting at counsel

5    table.

6              THE COURT:  Yes.

7    Q.  Which of the two patrol cars stopped the defendant's car?

8    A.  My car.

9    Q.  And why did you stop the car?

10   A.  We observed the vehicle to be double-parked, as well as the

11   smell of marijuana coming from the vehicle.

12   Q.  Did you receive a dispatch from the other car regarding the

13   stop?

14   A.  That's correct.

15   Q.  Approximately where did you stop the defendant's car?

16   A.  Between 138 and 139 St. Ann's Avenue.

17   Q.  I want to focus now on the events that took place after you

18   stopped the defendant's car.

19              Did you approach the defendant's car after the stop?

20   A.  That's correct.

21   Q.  What side did you approach?

22   A.  The passenger side.

23   Q.  Was anyone else in the car?

24   A.  Just Mr. Bell.

25   Q.  About how close were you to the passenger side of the car

1    when you approached?

2    A.   Not far; less than a foot.

3    Q.   Were the defendant's car windows open or closed?

4    A.   Open.

5    Q.   They were open.

6         Was the front passenger window open or closed?

7    A.   It was open.

8    Q.   Was the passenger door -- front passenger door open or

9    closed?

10   A.   It was closed.

11   Q.   Did you look inside the car at this point?

12   A.   Yes, I did.

13   Q.   What did you see?

14   A.   I observed a backpack.

15   Q.   Where was that backpack?

16   A.   Seated on the front passenger side of the vehicle.

17   Q.   Did you make any other observations about the car when you

18   approached?

19   A.   Yes.  The car smelled of marijuana.

20   Q.   What did the backpack look like?

21   A.   It was a camouflage backpack.

22   Q.   How many compartments did it have?

23   A.   Multiple compartments.

24        MR. BRADLEY:  Ms. Fetman, can you please publish

25   what's in evidence as Government Exhibit 308.

1    Q.  Officer White, do you recognize this?

2    A.  Yes, I do.

3    Q.  What is this?

4    A.  The backpack in regards to the arrest.

5    Q.  Is this basically -- did you observe the backpack basically

6    as it appears on this photograph?

7    A.  That's correct.

8    Q.  So specifically it was laying flat?

9    A.  That's correct.

10   Q.  Was the compartment -- so it was facing this way up;

11   correct?

12   A.  Yes, it was laying flat.  Slightly open.

13          THE COURT:  What was slightly open?

14          THE WITNESS:  The backpack.  The main compartment of

15   the backpack.

16   Q.  What was the main -- what would you describe on this

17   photograph as the main compartment?

18   A.  The larger side of the backpack which opens up.

19   Q.  Could you just describe -- perhaps just point out what part

20   of the backpack you're referring to?

21   A.  The -- right there.

22   Q.  Where the circle currently appears?

23   A.  Yes.

24          THE COURT:  For the record, that indicates the

25   compartment that is zipped by the zipper pull which is closest

1   to the bottom border of the photograph which constitutes

2   Government Exhibit 308.

3           Go ahead.

4           MR. BRADLEY:  Thank you.

5   BY MR. BRADLEY:

6   Q.  So Officer White, could you describe how that compartment

7   looked to you when you looked in the car?

8   A.  Sure.  As I said, it was lying flat down.  And it was

9   slightly open, about five to seven inches.

10  Q.  When you say five to seven inches, is that like the

11  weight -- excuse me, was that the length that the zippers were

12  apart?

13  A.  That's correct.

14          MR. BRADLEY:  Ms. Fetman, could you please publish

15  Government Exhibit 310 side-by-side with Government Exhibit

16  308.

17  Q.  Now, Officer White, we're currently seeing Government

18  Exhibit 308 on the left side of the screen and Government

19  Exhibit 310 on the right side of the screen.

20          Could you describe what -- based on your observations

21  of the backpack, what compartment you're looking at on the

22  right side of the screen?

23  A.  That's the main compartment.

24  Q.  What you would describe as the main compartment?

25  A.  That's correct.

1    Q.  From your vantage point, Officer White, were you able to

2    see inside this compartment?

3    A.  Yes, I was.

4           MR. BRADLEY:  Ms. Fetman, if you could please put

5    Government Exhibit 308 back on the screen alone.

6    Q.  What, if anything, did you observe inside this partially

7    opened compartment?

8    A.  I observed a magazine, transparent, which contained

9    multiple cartridges lodged inside of the magazine, with a clear

10   base, with a black case.

11          THE COURT:  Officer, let me just make sure I

12   understand your testimony.

13          That zipper pull that's at the bottom of the

14   photograph --

15          THE WITNESS:  Yes.

16          THE COURT:  -- that's in the open position in the

17   photograph, right?

18          THE WITNESS:  Yes.

19          THE COURT:  And if that zipper was open five to seven

20   inches, that zipper pull would have been somewhere around the

21   end of the zipper that is further to the left in the

22   photograph, right?  Further to the left and closer to the

23   viewer, yes?

24          THE WITNESS:  That's correct.

25          THE COURT:  And you saw the magazine through a

K1EVBELH                    White - direct

1    five-to-seven-inch opening there?

2              THE WITNESS:  That is correct, your Honor.

3              THE COURT:  How are you able to see that?

4              THE WITNESS:  The zippers were open a little further

5    up, towards the top of the bag.

6              THE COURT:  So more than five to seven inches?

7              THE WITNESS:  No, five to seven inches, roughly.

8              MR. BRADLEY:  Your Honor, may I approach with the

9    physical exhibit?

10             THE COURT:  Well, we'll do that in a minute.

11             But that means, looking at this photograph, the zipper

12   to the main compartment that is hidden behind what's at the top

13   of the photograph, that whole side was zipped, right?

14             THE WITNESS:  I'm sorry, I don't understand.

15             THE COURT:  The zipper pull at the bottom.

16             THE WITNESS:  Yes, that's where the magazine and the

17   firearm --

18             THE COURT:  All right.  But stay with me.

19             THE WITNESS:  Okay.

20             THE COURT:  The main compartment zipper is the one

21   controlled by that zipper pull at the bottom of the photograph,

22   right?

23             THE WITNESS:  Yes.

24             THE COURT:  And that was pulled five to seven inches

25   to the left, yes?

1          THE WITNESS:  I mean, the bag is --

2          THE COURT:  In the photograph, if you -- the condition

3    the bag was in when you saw it had the zipper pull five to

4    seven inches to the left of where the zipper pull appears in

5    the photograph, true?

6          THE WITNESS:  So, I mean, the best I can describe it

7    is the backpack being laid flat down this way and the zippers

8    being around this much --

9          THE COURT:  Look at the photograph.  Just stay with me

10   about the photograph, right?

11         THE WITNESS:  Okay.

12         THE COURT:  The zipper to which that bottom pull is

13   attached is the one that sort of runs diagonally from the lower

14   right upward to the left in the photo, right?  You see that?

15         THE WITNESS:  Yes.

16         THE COURT:  Just where the indicator is going,

17   counsel's drawing indicator.

18         And that portion of the main compartment was open when

19   you saw this, right?

20         THE WITNESS:  Yeah, but from the other side.  I mean,

21   that's the best I can --

22         THE COURT:  I'm sorry.

23         THE WITNESS:  From the other side.  The bag was laid

24   face down this way.  So the zippers were open from this side in

25   my line of sight.

K1EVBELH                    White - direct

1          THE COURT:  All right.  But your line of sight was

2      essentially what we're looking at in this photograph, right?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  So there was five to seven inches

5      of that zipper that appears diagonally in the photo that was

6      nearest to you and it was open.

7          THE WITNESS:  Yes.

8          THE COURT:  And then as you continue that zipper, it

9      goes up in the photograph to the left, and then it goes all the

10     way around the bag, right?

11         THE WITNESS:  Yes, the zipper goes all the way around.

12         THE COURT:  And that part, everything to the left of

13     the five-to-seven-inch opening, and up around the end of the

14     bag, and then down the top side of the bag in the photograph,

15     that was all zipped, right?  It was closed, yes?

16         THE WITNESS:  I'm sorry, I don't understand what

17     you're trying --

18         THE COURT:  Well, I understand you are.  I wish I

19     could be clearer.

20         Let's go back to the 310.  Put 310 up.

21         MR. BRADLEY:  Yes, your Honor.

22         THE COURT:  All right.  310.  Same bag, right?

23         THE WITNESS:  Yeah, same bag.

24         THE COURT:  And the zipper we're talking about is this

25     big U-shaped zipper that you see in the left of the picture.

1   And then you see it around the top of the bag which is to the

2   right of the zipper.

3           THE WITNESS:  That's correct.

4           THE COURT:  Okay.  So when you saw this bag, it was

5   in, essentially, this position, but it was -- the top was

6   closed.

7           THE WITNESS:  The top was closed, and you would have

8   to swing the bag around to -- to -- so from my angle, the bag

9   was face down as it is, and open about five to seven inches on

10  my side, not the opposite side.  I think you're trying to say

11  the opposite side was open?

12          THE COURT:  No, no.

13          THE WITNESS:  Okay.

14          THE COURT:  The side closest to the viewer in this

15  picture --

16          THE WITNESS:  Exactly.

17          THE COURT:  -- was this part that was partially open.

18          THE WITNESS:  Yes, that's correct.

19          THE COURT:  And the rest of that big zipper that goes

20  all the way around --

21          THE WITNESS:  That was closed.

22          THE COURT:  -- that was closed.

23          THE WITNESS:  That was closed, your Honor, yes.

24          THE COURT:  So you are seeing this magazine through

25  the five-to-seven-inch gap in a zipper where the rest of that

K1EVBELH                    White - direct

1    cover of the backpack is zipped closed.

2              THE WITNESS:  That's correct.

3              THE COURT:  Okay.  Let's move on.

4              And I guess my question was how could you see that

5    magazine through that?

6              THE WITNESS:  Well, I'll be honest with you, your

7    Honor, I've never --

8              THE COURT:  That's the idea.

9              THE WITNESS:  I've never seen a clear magazine.  That

10   was the first time, and it caught my eye.  It wasn't

11   protruding, but it was in plain sight for me to see.

12             THE COURT:  I'm sorry, you said it wasn't -- did you

13   say it was protruding or it wasn't?

14             THE WITNESS:  It wasn't protruding out, but it was

15   placed where I could see it.  That was the first I've ever

16   seen --

17             THE COURT:  How wide was the gap between the two

18   halves of the zipper where the zipper was open?

19             THE WITNESS:  I don't understand what you mean.

20             THE COURT:  Look, to close a zipper there are two

21   parts to the zipper.

22             THE WITNESS:  Yeah, they were about five to seven

23   inches apart.

24             THE COURT:  I see.

25             So when you say they are five to seven inches apart,

1    you don't mean that there's five to seven inches of the zipper

2    unzipped, you mean that the two halves of the zipper --

3              THE WITNESS:  Exactly.

4              THE COURT:  -- are five to seven inches.

5              THE WITNESS:  Exactly.

6              THE COURT:  How much of the zipper was opened

7    laterally, the length of the zipper?  The zipper is probably 30

8    inches all the way around the bag.

9              THE WITNESS:  About seven inches of the zipper was

10   open, approximately five to seven inches was open.

11             THE COURT:  I don't know where I'm getting with this.

12             Okay.  Let's go ahead.

13             MR. BRADLEY:  Your Honor, may I approach with the

14   physical exhibit?

15             THE COURT:  Yes.

16             MR. BRADLEY:  Thank you.

17   BY MR. BRADLEY:

18   Q.  Officer White, I'm handing you what has been marked as

19   Government Exhibit 103.  Can you identify this?

20   A.  Yes.  That's the bag in regards to the arrest.

21             THE COURT:  Okay.  Now, when you saw the bag on the

22   seat, which side of the bag was on the seat and which side was

23   the upside?

24             THE WITNESS:  So this is exactly how the bag was laid

25   down.

1          THE COURT:  Okay.  So just for the record, before you

2     move it, there are two cloth strips across the top, one on

3     either side of what seems to be a piece of Velcro or something

4     else with some texture.  The third strip or the second cloth

5     strip has at either end a plastic half of some kind of a snap

6     or fastener.  And below that, there is a small compartment

7     about a third or half the height of the backpack.  It has its

8     own zipper.  And then that's -- let's call it the bottom lid of

9     the backpack.  And the bottom lid has one great big zipper that

10    goes all the way around three sides of the backpack.  Okay.

11         Now, show me what you are talking about please.

12         MR. MARCUS AMELKIN:  Your Honor, may I approach and

13    watch?

14         THE COURT:  Sure.

15         MR. MARCUS AMELKIN:  Thank you.

16         THE WITNESS:  So that's how the bag was placed.  And

17    the magazine was right here.

18         THE COURT:  I see.  All right.

19         So it turns out that there are two -- at least two

20    zipper pulls on that long zipper.  And the officer has put one

21    of them about eight or ten inches away from the bottom of the

22    bag, and from that zipper pull to the bottom of the bag is all

23    closed.  Then there's a gap of five to seven inches in which

24    the lid is not zipped.  Then there's another zipper pull which

25    is closed, and then the rest of the zipper around the bag is

1    closed.  Did I describe that right?

2              THE WITNESS:  Yes, you did, your Honor.

3              THE COURT:  Okay.  And I would say, looking at the bag

4    as you have placed it, Officer, there is at a maximum in the

5    portion of the zipper, the halves of which are not zipped, a

6    width of three-quarters of an inch.  Would everybody agree to

7    that?  Counsel?  Yes?

8              MR. MARCUS AMELKIN:  Yes.

9              THE COURT:  Yes?

10             MR. BRADLEY:  Yes.

11             THE COURT:  Okay.  And through that

12   three-quarter-of-an-inch gap, which is about five to seven

13   inches long, you saw this magazine?

14             THE WITNESS:  That's correct, your Honor.

15             THE COURT:  And it was not protruding.

16             THE WITNESS:  No, I was able to see it.  No.

17             THE COURT:  Okay.

18   BY MR. BRADLEY:

19   Q.  Officer White, just before we go further, you heard from

20   the Court some questions regarding the distance between the two

21   zippers in the open compartment, and I believe that was

22   described as three-quarters of an inch.  That's, of course,

23   sitting here at counsel table.

24             Is that approximately the same distance or was more or

25   less visible when you saw it at the car?

1    A.   Approximately.

2    Q.   Approximately the same?

3    A.   Yes.

4    Q.   Now, when you mentioned a magazine or a cartridge, what did

5    you mean by that?

6    A.   The magazine is what's used to fire the -- the firearm.

7    The bullets were lodged in the magazine.

8              THE COURT:  It was a Glock, right, a nine-millimeter?

9              THE WITNESS:  Yes.

10             MR. BRADLEY:  Sorry, your Honor.

11             THE COURT:  No, no.  Go ahead.

12   BY MR. BRADLEY:

13   Q.   But the ammunition cartridge itself, to clarify, you did

14   not see the handgun itself?

15   A.   No.

16             MR. BRADLEY:  Ms. Fetman, would you please publish

17   what's in evidence as Government Exhibit 312.

18   Q.   Officer White, do you recognize this?

19   A.   Yes, I do.

20   Q.   What are we looking at?

21   A.   The firearm and the magazine.

22   Q.   Now, again, just to be clear, you did not observe the gun

23   and the cartridge from your perspective outside the car, just

24   the cartridge; correct?

25   A.   Just the magazine, yes.

1   Q.   Just the magazine.

2            And when you say "cartridge," what are you referring

3   to?

4   A.   The bullets.

5   Q.   The bullets inside?

6   A.   Yes.

7   Q.   Could you describe also what we are seeing below the

8   bullets on that picture of the magazine?

9   A.   It's the spring and the base.

10  Q.   The base.  And the base is the bottom, that black part?

11  A.   Yes, that's correct.

12  Q.   And surrounding that is a casing; correct?

13  A.   Yes, a transparent case.

14  Q.   Is it common or rare for an ammunition cartridge to be

15  transparent like that?

16  A.   Rare.

17           MR. MARCUS AMELKIN:  Objection.

18  A.   As I said, it was the first time I've seen it.

19  Q.   Was that what caught your eye?

20  A.   Yes, it is.

21  Q.   Officer White, approximately how much of that cartridge was

22  visible to you from where you were standing?

23  A.   I'm not sure whether it was the base or the -- the spring,

24  but I definitely saw the clear cartridges lodged in the

25  magazine.

1           THE COURT:  So you saw the rounds?

2           THE WITNESS:  Yes.  Yes.

3           THE COURT:  Excuse me.

4           What was the weather like that afternoon?

5           THE WITNESS:  Clear, sunny day.

6           THE COURT:  Sunny day.  Okay.

7    BY MR. BRADLEY:

8    Q.  And again, approximately what time was this, Officer White?

9    A.  Afternoon.

10   Q.  About 3:55 p.m.?

11   A.  Around that time, yes.

12   Q.  On June 28th, 2019?

13   A.  That's correct.

14          THE COURT:  And the car is on the south side of St.

15   Ann, is that right, when you saw this?  I'm sorry, St. Ann runs

16   north and south.  It's on the east side or the west side of St.

17   Ann?

18          THE WITNESS:  Well, we were traveling northbound on

19   St. Ann's.

20          THE COURT:  Right.  Okay.

21          And when you stopped the car, was it on the east side

22   of St. Ann's or the west side?

23          THE WITNESS:  The east side.

24          THE COURT:  And it was almost 4 o'clock in the

25   afternoon, so the sun was to the left side; is that right?

K1EVBELH                    White - direct

1          THE WITNESS:  I don't recall which side the sun was

2    on, your Honor.

3          THE COURT:  Well, if the car was facing northbound,

4    the west is the left side of the car, yes?

5          THE WITNESS:  Yes.

6          THE COURT:  I mean, I think that's pretty well

7    established.  Sun sets in the west every day same time.  Not

8    exactly.

9          Okay.  Go ahead, counsellor.

10   BY MR. BRADLEY:

11   Q.  So just to clarify from the questions the Court was asking,

12   would you describe your view as well-lit?

13   A.  Yes.

14   Q.  Was anything in between you and the car at the time?

15   A.  No.

16   Q.  Based on these observations, Officer White, what did you do

17   next?

18   A.  I immediately grabbed the bag and opened the bag up.  And

19   that's when I observed the firearm.

20   Q.  When you say that you picked up the backpack, how did you

21   pick it up?

22   A.  I reached into through the window and picked up the

23   backpack.

24   Q.  Did you open the door of the car?

25   A.  No.

1   Q.   What part of the bag did you open?

2   A.   The main compartment.

3   Q.   This was the compartment that was already partially open?

4   A.   That's correct.

5   Q.   That was the same compartment where you saw the ammunition?

6   A.   That's correct.

7   Q.   And what was the firearm that you saw inside of the bag?

8   A.   What do you mean?

9   Q.   I'm sorry.  You said you examined the bag.  What happened

10  next?

11  A.   At that point I examined the bag, found the firearm as

12  well, and I gave the code to my teammates to place Mr. Bell in

13  restraints.

14  Q.   Turning back to Government Exhibit 312 in front of you, is

15  that the gun on the left side of the screen that you saw on the

16  backpack?

17  A.   Yes, it is.

18  Q.   And what did you mean by calling out an arrest code or

19  signal?

20  A.   92 is the arrest code that we utilize in regards to an

21  arrest.

22  Q.   What did you do with the backpack containing the gun and

23  ammunition cartridge?

24  A.   It was safeguarded back to the precinct.

25  Q.   Who safeguarded it?

K1EVBELH                    White - direct

1    A.  I did.

2    Q.  And what did you do after that?

3    A.  At that point it was locked up and stored and handed over

4    to the evidence collection team which is part of NYPD for

5    further processing.

6              MR. BRADLEY:  Your Honor, may I approach with

7    Government Exhibits 102 and 103?

8              THE COURT:  Yes.

9    Q.  Officer White, before you is Government Exhibit 102.  It's

10   currently next to Government Exhibit 103.

11             Do you recognize Government Exhibit 102?

12   A.  Yes, I do.

13   Q.  And what is inside the evidence bag there?

14   A.  The firearm, the magazine, and the cartridges.

15   Q.  Now, looking at that magazine, could you describe what you

16   meant by it being clear or transparent?

17             THE COURT:  It's unnecessary.  I can see it.

18   Q.  There are bullets in a small envelope to the left or inside

19   that evidence bag.  Is that how those bullets appeared to you

20   when you first saw the ammunition cartridge?

21   A.  Yes, they were lodged inside of the magazine.

22   Q.  So it is not they have since been taken out of the

23   magazine?

24   A.  That's correct.

25             MR. BRADLEY:  Ms. Fetman, could you please publish

1    Government Exhibit 310 on the screen please.

2            Your Honor, as a bit of housekeeping, I believe we had

3    some testimony about this, but just for the record, the

4    government offers Government Exhibit 310.

5            THE COURT:  All right.  Received.

6            (Government's Exhibit 310 received in evidence)

7    Q.  Officer White, we've seen in this photograph some other

8    objects.  What are these objects inside the backpack?

9    A.  A pair of blue pants and a travel case, as well as the

10   magazine.

11   Q.  And are those -- and turning to Government Exhibit 103 in

12   front of you, are those objects inside of the backpack itself?

13   A.  Yes, they are.

14   Q.  And to clarify, the case that you're referring to, did you

15   see the ammunition or the firearm inside of that case?

16   A.  No.

17   Q.  They were not in the case?

18   A.  No, they weren't.

19   Q.  Officer White, were you wearing a body camera during this

20   incident?

21   A.  Yes, I was.

22   Q.  When did you turn your body camera on?

23   A.  Upon exiting the vehicle, my vehicle.

24   Q.  Excuse me.

25           When did you turn your body camera on?

1    A.  Exiting my vehicle.

2    Q.  Exiting your vehicle?

3    A.  Yes.

4    Q.  When are officers supposed to activate their body cameras?

5    A.  Before exiting their vehicle.

6    Q.  Before exiting the vehicle.

7            Did you do that here?

8    A.  No, I didn't.

9    Q.  So to clarify, you turned it on at some point after --

10   A.  That's correct.

11   Q.  -- exiting the vehicle?

12           Why didn't you follow that practice here?

13   A.  I simply forgot.

14           MR. BRADLEY:  One moment, your Honor.

15           (Counsel conferred)

16           MR. BRADLEY:  Nothing further, your Honor.

17           THE COURT:  Thank you.

18           We'll take about -- we'll take till a quarter past

19   four.

20           (Recess)

21           THE COURT:  Okay.  Let's go.

22           Mr. Amelkin.

23           MR. MARCUS AMELKIN:  Thank you, your Honor.

24

25   CROSS-EXAMINATION

1   BY MR. MARCUS AMELKIN:

2   Q.  Officer White, in the course of your career, you've had 18

3   CCRB charges made against you; correct?

4           MR. BRADLEY:  Your Honor, the government would renew

5   its objection.

6           THE COURT:  We're not going to do that.  Move on.

7           MR. MARCUS AMELKIN:  You don't want to hear the

8   evidence as to --

9           THE COURT:  I read the evidence.  I read your papers.

10          MR. MARCUS AMELKIN:  But the CCRB materials were not

11  included in our papers, your Honor.

12          THE COURT:  You told me the bottom line, that there

13  were two substantiated charges, and we all know what that means

14  and doesn't mean.  And then there are presumably, from what you

15  just said, 16 that weren't.  And you can be sure I don't need

16  to hear about that.

17          MR. MARCUS AMELKIN:  I'm sorry, you mean the

18  government's motion *in limine* papers.

19          THE COURT:  Yes.  That was a collective "your," those

20  of you in this case.

21          MR. MARCUS AMELKIN:  The collective "we," your Honor.

22          THE COURT:  Right.

23  BY MR. MARCUS AMELKIN:

24  Q.  Officer White, you know it's important to follow police

25  rules, yes?

K1EVBELH                    White - cross

1    A.  Correct.

2    Q.  And when you arrested Mr. Bell, you were wearing a body

3    camera?

4    A.  Correct.

5    Q.  You were trained how to use it?

6             THE COURT:  I've been listening to this all afternoon.

7             MR. MARCUS AMELKIN:  Okay.

8             THE COURT:  I got this point about 2 o'clock.

9    Q.  Let's watch your body camera together, your footage

10   together, which is Government Exhibit 202A.  I'll ask you to

11   just watch it, and I'll ask you some questions about it at the

12   conclusion of watching the video.

13            (Video played)

14   Q.  Now, let's start with -- Officer White, you testified on

15   direct examination that you activated your camera as soon as

16   you exited your vehicle.  But isn't it correct that this camera

17   starts when you're already holding the backpack?  The video

18   footage starts when you're already holding the backpack?

19   A.  There's a buffer.  So, I mean, I activated it once I exited

20   my vehicle.  I can't tell you exactly when I activated it, but

21   I activated it upon exiting my vehicle.

22   Q.  So you're saying that the video camera itself has a buffer,

23   and the sound has a separate buffer?

24   A.  There's a buffer.

25   Q.  How long is the buffer?

1    A.  Thirty seconds.

2    Q.  Isn't it accurate that the buffer is to sound, but not to

3    video footage?

4    A.  Video footage as well goes back 30 seconds.

5    Q.  So the camera does not start for 30 seconds, and then the

6    audio doesn't start for a minute?

7    A.  Thirty seconds as well.

8    Q.  Well, 30 seconds of buffer time, you said, plus another 30

9    seconds, right?

10   A.  No, just 30 seconds in total.

11   Q.  Right.  So isn't it accurate that only the sound is

12   buffered and not the video?

13   A.  The sound is buffered; correct.

14   Q.  Right.  But not the video?

15   A.  The video goes back as well 30 seconds.

16   Q.  Okay.  During this video, did you ever show it to the

17   camera the ammunition in plain view?

18   A.  Well, the -- could you repeat that?

19   Q.  Did you ever show into your body camera the ammunition in

20   plain view?

21   A.  No, my body camera is placed on my -- my vest, my

22   ballistic --

23   Q.  Did you bend down to show the interior of the car?

24   A.  I don't know what's being recorded.  The only thing that's

25   being recorded is directly what's in front of me.

1  Q.  Right.  But you can manipulate your body, right?  Like,

2  when you turned right, we saw a different part of the street.

3  A.  No, I didn't manipulate my body.  I'm simply performing my

4  task as a police officer and grabbing the bag and examining it.

5  What's captured on video is what's directly in front of me.

6  Q.  Right.  But what I'm asking you, Officer, is when you

7  turned your body, the camera turns with you?

8  A.  Yes.

9  Q.  And you did not show any marijuana on the video; correct?

10 A.  I don't know what -- what do you mean if I didn't show any

11 marijuana on the video?

12 Q.  I'm asking you if your body camera recorded any marijuana

13 in plain view?

14 A.  Well, the marijuana was in plain view, but my body camera

15 focused on the backpack and what was recorded from the

16 passenger side of the vehicle.

17 Q.  So it's interesting you say that.  You say that the body

18 camera focused on the backpack, but you never show the backpack

19 with the body camera; correct?

20 A.  Well, as I stated, the camera is attached to my ballistic

21 vest; so whatever is in front of me is what's going to be

22 captured.  I can't control to manipulate the camera.  The

23 camera speaks for itself.

24 Q.  Right.  But you could lift the backpack up.

25          MR. BRADLEY:  Your Honor, I object.

1          THE COURT:  Look, we've watched the videos, right?

2    And whatever is there, is there.  And if it doesn't have the

3    seventh game of the '55 World Series, it's not there.

4    Q.  So let's talk about the backpack that's in front of you.

5    When you opened it, Mr. Bell's work clothes were in the bag,

6    yes?

7    A.  Yes.

8    Q.  And there was a little black case?

9    A.  That's correct.

10   Q.  Do you mind taking out the black case and showing it to the

11   Court.

12          THE COURT:  I've seen it already.  You remember I had

13   the backpack up here.

14   Q.  And is your testimony that that black case did not contain

15   the gun?

16   A.  That is correct.

17   Q.  And it is also your testimony that it did not contain the

18   ammunition clip?

19   A.  The magazine, that is correct.

20   Q.  Although both can be held securely in that case; correct?

21   A.  I don't -- I wouldn't be able to tell you.

22   Q.  Well, you have them both in front of you.

23          THE COURT:  Go ahead.

24   A.  From what I can tell, both wouldn't be able to fit inside

25   the travel case.  This magazine is a high-capacity magazine.

K1EVBELH                    White - cross

1    Q.   Okay.

2              THE COURT:  Yeah, no, I can see.  Thank you.

3    Q.   And that black case was in the backpack?

4    A.   Excuse me?

5    Q.   The black case was in the backpack?

6    A.   Yes.

7    Q.   You were in the van that pulled over Mr. Bell, yes?

8    A.   That's correct.

9    Q.   And the windows were up in the van?

10   A.   No.

11   Q.   What windows were down?

12   A.   My window was down.

13   Q.   You were in the front passenger seat?

14   A.   That's correct.

15   Q.   And when the van -- when you drove past Mr. Bell the first

16   time, did you observe smoke coming from Mr. Bell's car?

17   A.   I smelled marijuana.

18   Q.   Did you see any smoke?

19   A.   No.

20   Q.   And Mr. Bell's driver's side window was up, yes?

21   A.   Not that I recall, no.

22   Q.   You believe it was down?

23   A.   Yes.

24   Q.   And you could smell the difference between burnt and

25   unburnt marijuana?

1   A.  It has a similar smell; burnt and unburnt has a similar

2   smell.

3   Q.  It's your testimony that you smelled burning marijuana?

4   A.  I smelled marijuana.

5   Q.  But you don't know if it was burnt or unburnt?

6   A.  Right.

7   Q.  When you were in the van, how did -- the stop was effected

8   by activating your lights and sirens; is that right?

9   A.  That's correct.

10  Q.  And then the van is equipped with a loudspeaker?

11  A.  That is correct.

12  Q.  And someone in the van told Mr. Bell to lower all of his

13  windows?

14  A.  Not that I recall.

15  Q.  You don't recall the loudspeaker saying to lower the

16  windows?

17  A.  No.

18  Q.  Did anybody make any statements over the loudspeaker?

19  A.  Not that I recall.

20  Q.  And when you approached the car, none of the officers

21  alerted to the marijuana, did they?

22  A.  I don't understand what you are saying.

23  Q.  Did anybody say there's marijuana in the car or provide a

24  code saying, We see drugs in plain sight?

25  A.  I couldn't tell you what anybody else did; I can tell you

1    what I focused on in regards to the stop of the vehicle.

2    Q.  Did you hear anybody alert to drugs?

3    A.  I wouldn't be able to tell you that.

4    Q.  You don't remember?

5    A.  Yeah, I can't recall.

6    Q.  None of the other officers pulled out the marijuana

7    during -- pulled out marijuana from the car during the stop?

8    A.  I know what I pulled out.  I pulled out the backpack.

9    Q.  Okay.  You testified on direct that you saw ammunition in

10   plain view; correct?

11   A.  That's correct.

12   Q.  But you did not alert the other officers at that point to

13   ammunition, did you?

14   A.  I examined the backpack.

15   Q.  That's not my question.

16          When you saw the ammunition in plain sight, did you

17   alert the other officers?

18   A.  No.

19   Q.  No.

20          THE COURT:  Did you call code 92 or whatever?

21          THE WITNESS:  Yes, code 92 was called.

22   Q.  But you only called code 92 after you removed the backpack

23   from the car, unzipped it, and recovered the firearm?

24   A.  That's correct.

25   Q.  Now, you were the one that drove Mr. Bell's car back to the

1    station; correct?

2    A.  I don't recall whether it was me or one of my teammates.  I

3    wouldn't be able to tell you.

4    Q.  You don't recall?

5    A.  No.

6    Q.  If you watch a body cam video showing you getting into the

7    driver's seat, would that refresh your recollection?

8    A.  Sure.

9         MR. MARCUS AMELKIN:  Pull up 202B please.

10        (Video played)

11        MR. MARCUS AMELKIN:  I think we can skip to the end,

12   like the last 15 or 20 seconds.

13        (Video played)

14   Q.  Was that you getting into the car?

15   A.  Yes.

16   Q.  Okay.  And did you drive the car back alone to the station?

17   A.  Yes.

18   Q.  Okay.  I want to go back to what you said about the

19   marijuana.  Where did you see it in plain view?

20   A.  I didn't see the marijuana in plain view.

21   Q.  You didn't see marijuana in the car?

22   A.  No.  My focus was the backpack.

23   Q.  And the marijuana though was not vouchered before you went

24   to the police station; correct?

25   A.  The marijuana wasn't vouchered?

K1EVBELH                       White - cross

1    Q.  Right.

2    A.  The marijuana was vouchered.

3    Q.  Not before you went to the police station.

4    A.  Once we were back at the police station.

5    Q.  So when you were in the car driving it from the place of

6    arrest to the police station, did you see the marijuana?

7    A.  No.  Well, the marijuana would have been recovered at the

8    scene, safeguarded, and I would have drove the vehicle back.

9    At the time -- at the time of the initial stop, I was the one

10   that retrieved the backpack, and the marijuana was recovered.

11   Q.  Who recovered the marijuana?

12   A.  I'm not sure who recovered the marijuana from the vehicle.

13   Q.  So it's your testimony the marijuana was removed from the

14   car prior to you taking it?

15   A.  Yes, it would have been removed.

16   Q.  And was the gun removed from the car before you took it?

17   A.  Was the gun removed from the vehicle?

18   Q.  Yes.

19   A.  Yes, the gun was safeguarded.

20   Q.  Do you recall in the cupholder of Mr. Bell's car there

21   being a portable ashtray, a cup ashtray?

22   A.  I mean, I didn't even recall driving the vehicle back to

23   the precinct, so I wouldn't be able to recall the contents

24   inside of the vehicle at the time.

25   Q.  Okay.

1          MR. MARCUS AMELKIN:  Just one moment.

2          (Counsel conferred)

3          MR. MARCUS AMELKIN:  All right.

4          No further questions, your Honor.

5          THE COURT:  Thank you.

6          Any redirect?

7          MR. BRADLEY:  No, your Honor.

8          THE COURT:  The witness is excused.

9          Before you're excused, I have a couple more questions.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Let's take the gun and the magazine off

12     the witness stand here for a minute.

13          MR. BRADLEY:  Yes, your Honor.

14          THE COURT:  Now, Officer, you observed that the

15     backpack -- which I think is Government Exhibit 103 -- has two

16     long sides, a rounded top, and a straight bottom.

17          Do you see that?

18          THE WITNESS:  Yes.

19          THE COURT:  Now, you say when you first saw it, it was

20     on the right front seat of the automobile.

21          THE WITNESS:  That's correct, your Honor.

22          THE COURT:  Was the rounded top facing the front of

23     the car, the flat bottom facing the front of the car, or one of

24     the long sides?

25          THE WITNESS:  It was just like this in the vehicle.

1    This part facing the front, this part facing the seat of the

2    vehicle.

3              THE COURT:  Indicating that the rounded top was facing

4    the front of the car; is that right?

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  All right.

7              And you were standing outside the right front door?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  Considering the rounded top as being the

10   top, the zipper that was partially open was on the left side of

11   the bag, right?

12             THE WITNESS:  The right side of the bag, your Honor.

13             THE COURT:  The right side.

14             THE WITNESS:  This side of the bag was open.

15             THE COURT:  So it was the side of the bag closer to

16   you?

17             THE WITNESS:  Yes, your Honor.

18             THE COURT:  Okay.

19             Any counsel want to examine further, in light of what

20   I've just discussed with the witness?

21             MR. BRADLEY:  Not from the government, your Honor.

22             MR. MARCUS AMELKIN:  Save it for argument, your Honor.

23             THE COURT:  Okay.  You are excused.

24             THE WITNESS:  Thank you.

25             (Witness excused)

1          THE COURT:  Anything else from the government?

2          MR. BRADLEY:  No, your Honor.

3          THE COURT:  Defendant?

4          MR. MARCUS AMELKIN:  Just one moment, your Honor.

5          (Counsel conferred)

6          MR. MARCUS AMELKIN:  We're going to call our client,

7   your Honor.

8          THE COURT:  All right.

9          MR. MARCUS AMELKIN:  Unless, of course, you want to

10  rule in our favor before we open the case.

11  DEMETRUES BELL,

12       called as a witness on his own behalf,

13       having been duly sworn, testified as follows:

14          THE COURT:  You may proceed, counsellor.

15  DIRECT EXAMINATION

16  BY MR. MARCUS AMELKIN:

17  Q.  Mr. Bell, how old are you?

18  A.  Thirty-seven years old, sir.

19  Q.  And where are you from?

20  A.  I'm from the South Bronx.

21  Q.  Have you ever testified in court before?

22  A.  No, sir.

23  Q.  How are you feeling right now?

24  A.  Feeling all right.

25  Q.  Okay.  Do you understand that you must tell the whole truth

1    today?

2    A.   Yes.

3    Q.   Okay.  And what would happen if the judge thinks you are

4    not telling the truth?

5    A.   I'd be in trouble.

6    Q.   At the time you were arrested for this case, how long had

7    you been home from prison?

8    A.   About two years -- about two years and some change.

9    Q.   Two years and some change.

10            And during that time, what were you doing with

11   yourself?

12   A.   I was working for the New York City Housing Authority.

13   Q.   Were you on parole?

14   A.   Yes, I was.

15   Q.   Okay.  And what did you have to do while you were on

16   parole?

17   A.   Numerous things.  I had to maintain employment, I had to

18   finish drug treatment, I had to finish anger management

19   treatment, I had to provide urine tests, and stay out of

20   trouble.

21   Q.   And what was your drug program like?

22   A.   Very intensive.  I had to report twice a week, random urine

23   tests, group sessions, one-on-one counseling sessions.  Pretty

24   much it.

25   Q.   Were you successful or unsuccessful in the drug program?

1    A.   I was successful.

2    Q.   What does that mean?

3    A.   I completed it.

4    Q.   During the time you were in the program, did you have any

5    positive tests?

6    A.   No.

7    Q.   Were you also drug-tested by parole?

8    A.   Yes.

9    Q.   How often?

10   A.   Like every month; once a month.

11   Q.   Okay.  And did you ever have any positive tests in the

12   parole -- in parole?

13   A.   No.

14   Q.   Before you went to prison -- how old were you when you went

15   to prison?

16   A.   I was 19 years old.

17   Q.   And before you went to prison, did you use any drugs?

18   A.   Yes.

19   Q.   Which ones?

20   A.   I used marijuana.

21   Q.   Okay.  How often?

22   A.   Every day.

23   Q.   And so you're familiar with marijuana?

24   A.   Yes.

25   Q.   And you know its smell and stuff like that?

1    A.  Yes.

2    Q.  Okay.  Have you used drugs at all since you've been home

3    from prison?

4    A.  No.

5    Q.  So you mentioned up front that you work for the New York

6    City Housing Authority.  Can you describe your responsibilities

7    for that job?

8    A.  I basically do transportation.  I'm responsible for all

9    debris, all sanitation bags with the housing authority stamp, I

10   do transportation of the staff, and I also pick up pipes,

11   windows, anything having to do with the authority.

12   Q.  And how did you get your job?

13   A.  I applied online.

14   Q.  And were they aware of your criminal record and things like

15   that?

16   A.  Yes, yes, definitely.

17   Q.  How many hours a week did you work?

18   A.  Forty hours.

19   Q.  And what were your hours?

20   A.  From 6 a.m. to 2:30 p.m.

21   Q.  What days?

22   A.  Monday through Friday and afternoon weekends, sometimes on

23   the weekend as well.

24   Q.  For overtime or something like that?

25   A.  Yes.

1    Q.  Are you still technically employed there?

2    A.  Yes.  I just resigned.

3    Q.  What does that mean?

4    A.  Well, since I'm incarcerated, they are holding my job for

5    me for about 18 months.  Resign.  They just don't keep you

6    working if you're not going to be there working.

7    Q.  Okay.

8            And how did you get back and forth each day from work?

9    A.  I drove my vehicle.

10   Q.  On the day you were arrested for this case, when did your

11   day start?

12   A.  Six o'clock in the morning.

13   Q.  And did you work that day?

14   A.  Yes.

15   Q.  And what time did your shift end?

16   A.  2:30 p.m.

17   Q.  What did you do when your shift ended?

18   A.  I parked the vehicle, I returned all my tools, and I report

19   to the locker room to change my clothes.

20   Q.  Okay.  And what did you do in the locker room?

21   A.  I changed my clothes.

22   Q.  Okay.  And what did you do next?

23   A.  I put my dirty clothes into my backpack.

24   Q.  Okay.  Can you describe everything that was in your

25   backpack and how it was packed up?

1    A.  Sure.  I had my work pants, then they were folded.  I had

2    the gun inside that black case which was in the bag.  And I put

3    my work clothes on top of the black case.

4    Q.  What was in the black case?

5    A.  The gun and the clip.

6    Q.  And was the black case zipped or unzipped?

7    A.  It was zipped.

8    Q.  And was the backpack's main compartment that you just heard

9    a whole lot about zipped or unzipped?

10   A.  All compartments was zipped.

11   Q.  All compartments were zipped?

12   A.  Yes.

13   Q.  Okay.  And then what did you do with your backpack?

14   A.  I put it in the passenger side, on the floor of the

15   passenger side of my vehicle, and I drove home.

16   Q.  Where were you headed?

17   A.  I was headed to 140th and St. Ann's Avenue.

18   Q.  And where do you work?  Where is the location of housing?

19   A.  I work on 125th Street and Amsterdam.

20   Q.  So what's the distance?

21   A.  Fifteen -- 15 minutes, 15, 20 minutes.

22   Q.  Okay.  What happened next?

23   A.  I proceeded to drive home.

24   Q.  Okay.  And did anything happen along the way?

25   A.  Yeah.  I see two of my friends on my way home.

1    Q.  And what did you do when you saw your friends?

2    A.  I was at a stoplight.  They asked me if I could drop them

3    off at the store.

4    Q.  What store are you referring to?

5    A.  The one right there, 138th Street.

6    Q.  Okay.  So from the time that you got in the car, did your

7    car smell -- when you got in your car after work, did your car

8    smell like anything?

9    A.  No.

10   Q.  And when your friends got in the car, were they smoking?

11   A.  No.

12   Q.  Did they smell of smoke?

13   A.  No.

14   Q.  Okay.  And where were your friends sitting in the car?

15   A.  I had -- one -- one guy was sitting in the passenger seat,

16   and another guy was sitting in the back seat.

17   Q.  So somebody was sitting in the front passenger seat?

18   A.  Yes.

19   Q.  And the backpack was on the ground beneath them?

20   A.  Yes.

21   Q.  Now, were your windows up or down?

22   A.  My windows were up.

23   Q.  How do you know?

24   A.  Because I rolled them up.

25   Q.  What happened next when you got to the store?

1   A.  I went, I got a Black & Mild from the store, I jump back in

2   my vehicle.  I was talking to a friend for a little minute.

3   And then I seen the police drive by.

4   Q.  Okay.  Can you just describe what a Black & Mild is and how

5   it was packaged?

6   A.  Yeah.  It's a cigar with, like, a smoker's tip.  It's

7   packaged in a plastic wrapping, I believe yellow and brown

8   wrapping.

9   Q.  Okay.  You didn't open it before you were arrested?

10  A.  I don't recall.  I don't think so.

11  Q.  Okay.  How did you know that they were police when they

12  drove past you?

13  A.  They was in a black van with tinted windows.

14  Q.  And you're familiar with that from the neighborhood or how?

15  A.  Yeah, from past experiences, detectives.

16  Q.  Okay.  What did you do when you passed by -- what did you

17  do when they passed by?

18  A.  I looked at them.

19  Q.  And then what did you do?

20  A.  I looked at the second car when it drive by, when it road

21  by too.

22  Q.  And then what did you do?

23  A.  I waited till they pass, and then I drove off.

24  Q.  And how much further did you have to go to get to your

25  place in the Bronx?

1   A.   Two blocks.

2   Q.   Okay.  Now, you've been sitting here, and you know that the

3   police say that your car -- that they smelled marijuana from

4   your car.  What do you think about that?

5   A.   That they lying.

6   Q.   Okay.  Did you smoke marijuana that day?

7   A.   No, sir.

8   Q.   Did anyone smoke marijuana in your car that day?

9   A.   No.

10  Q.   Did you have any marijuana out in your car?

11  A.   No.

12  Q.   Now, does anyone ever smoke in your car?

13  A.   Yes.

14  Q.   Okay.  And what do they smoke and how -- like, who smokes

15  in your car?

16  A.   My girlfriend smokes in my car.

17  Q.   And what does she smoke?

18  A.   Weed.

19  Q.   Anything else?

20  A.   Cigarettes.

21  Q.   Okay.  And what did they do -- what does your girlfriend do

22  with the ashes when she smokes?

23  A.   She dump them in the ashtray or dump them out the window.

24  Q.   Okay.  Every single time?

25  A.   Yeah.  I keep my car clean.  I don't play that.

1    Q.  Okay.  When you say you keep your car clean, what does that
2    mean?  What do you do to keep your car clean?
3    A.  I clean out my car daily.  I don't -- I don't like ashes
4    and stuff in my car.  I keep it clean.
5    Q.  How often do you get a car wash?
6    A.  Every three, four days.
7    Q.  Okay.  Sitting next to you is Defense Exhibit A.  Can you
8    take a look at it.  It's the cup.
9    A.  Mm-hmm.
10   Q.  Is that similar to the ashtray that you had in your car?
11   A.  Yes.
12   Q.  So is it possible that there were butts, either cigarettes
13   or marijuana or otherwise, at the bottom of the ashtray?
14   A.  Yes, that's possible.
15   Q.  Was there anything, any butts sitting at the top of it when
16   the police pulled you over?
17   A.  No.
18   Q.  When the police pulled you over, did you have a few moments
19   before the police walked up to the car?
20   A.  Yes.
21   Q.  And what did you do during that period?
22   A.  I got my ID, my ID ready.
23   Q.  Did you look around the car?
24   A.  Yeah.
25   Q.  Okay.

1    A.   Yes.

2    Q.   And would you have time, if there were butts sitting on top

3    of the ashtray, to put it down below?

4    A.   Yes.

5    Q.   What happened when they first approached the car?

6    A.   The officer approached the car.  He asked me -- he said,

7    What is that from the store?

8    Q.   Okay.  And what did you say?

9    A.   I told him nothing.

10   Q.   Okay.  Why did you tell him nothing?

11   A.   Because I figured he was talking like about illegal

12   activity and stuff.  I told him I didn't pick up nothing.

13   Q.   Okay.  And then what happened next?

14   A.   And then he said, License and registration.  He asked me

15   for my license and registration.  I provided that with my ID

16   card; gave him my ID card too.

17   Q.   What do you mean your ID card?

18   A.   Well, my license, my registration, and my ID card are all

19   together.

20   Q.   What is the difference between your license and your ID

21   card?

22   A.   My ID card is my appointment ID.  And when I speak about

23   my -- my ID card, it's the -- the driver's license, my driver's

24   license.  It's two different forms of ID I carry.

25   Q.   I understand.

1          What did they say to you next?

2    A.   They tell me, Get out the car.

3    Q.   Did they mention marijuana to you at all?

4    A.   No.

5    Q.   What happened next?

6    A.   They told me, Get out the car.

7          And then they took me to the back of the car, they

8    start searching me and stuff.  And then they took me, like,

9    around, like, to the trunk of the car.  And then they handcuff

10   me.

11   Q.   Okay.  And they handcuffed you because you had a gun that

12   you're not allowed to have?

13   A.   Yes.

14   Q.   And you know you weren't allowed to have the gun?

15   A.   Yes.

16        MR. MARCUS AMELKIN:  Thank you, your Honor.

17        THE COURT:  Thank you.

18        Cross-examination.

19   CROSS-EXAMINATION

20   BY MR. BRADLEY:

21   Q.   Mr. Bell, you understand that you have to tell the truth

22   today on the stand; correct?

23   A.   Yes.

24   Q.   And you understand that you filled out a declaration as

25   part of this case; correct?

1    A.  Yes.

2    Q.  And you knew that you had to be truthful in that

3    declaration as well, right?

4    A.  Yes.

5    Q.  In fact, you signed that declaration, right?

6    A.  Yes, I did.

7    Q.  Okay.  And you signed that declaration under the pains and

8    penalties of perjury; correct?

9    A.  Yes.

10   Q.  You know what perjury is?

11   A.  Yes.

12   Q.  Okay.

13          MR. BRADLEY:  Ms. Fetman, could you please pull up the

14   defendant's declaration and publish it on the screen please.

15   Q.  Mr. Bell, this is your declaration; correct?

16   A.  It says "declaration."

17   Q.  Okay.  It's three pages long?  Excuse me, four pages long?

18   A.  I can only see one.

19   Q.  We'll scroll through all four of them.  There we go.

20          And that's your signature on the bottom right?

21   A.  Mm-hmm.

22   Q.  And you signed that on December 8th?

23          All right.  I'd like to take you -- I'd like to take

24   you to paragraph 6 of that declaration.

25          MR. BRADLEY:  Excuse me.  Paragraph 8, Ms. Fetman.

1          Thank you.

2    Q.  Now, Mr. Bell, you said that you arrived at a grocery

3    store, and that was a grocery store on East 137th Street;

4    correct?

5    A.  Yes.

6    Q.  That's close to right where St. Ann's Avenue is, right?

7    A.  Yes.

8    Q.  And you said on paragraph 8 that you stayed in the car with

9    engine running outside of the grocery store, right?

10   A.  Can you repeat that again?

11   Q.  Well, it says right here you stayed in your car with the

12   engine running after you arrived at the grocery store, right?

13   A.  Stayed in my car -- it says I stayed in my car with the

14   engine running outside while speaking with friends.

15   Q.  Okay.  And then you said you exited the car briefly to

16   purchase a Black & Mild cigar from the store?

17   A.  Yes.

18   Q.  So you left the car running when you exited the car, right?

19   A.  Yes.

20   Q.  So you left your car sitting there on the street?

21   A.  Yes.

22   Q.  And that was right on East 137th Street?

23   A.  Yes.

24   Q.  Okay.  Now, you also, in paragraph 7, said that when you

25   were driving home, you drove past several friends.  And you

1    testified today that you -- that you saw some friends at a

2    stoplight; correct?

3    A.   Yes.

4    Q.   And that they asked that you drive them to that grocery

5    store, right?

6    A.   To a grocery store, yes.

7    Q.   To a grocery store.  And you said you drove them to that

8    grocery store on East 137th Street?

9    A.   Yes.

10   Q.   And then they got out of the car when you got to East 137th

11   Street, that's what you testified?

12   A.   Yes.

13   Q.   Okay.  And that's the same grocery store that you got out

14   of the car on, as well?

15   A.   Yes.

16   Q.   Okay.  Now, you've been in court during this entire

17   hearing, which began about 2:15 this afternoon; correct?

18   A.   Mm-hmm.

19        MR. BRADLEY:  All right.  Ms. Fetman, could you please

20   pull up Government Exhibit 200A.

21   Q.   You've seen this video, right?

22   A.   Yes.

23   Q.   You were in court when you saw this?

24   A.   Yes.

25        MR. BRADLEY:  And why don't we just play this video

1    here, Ms. Fetman, if you don't mind.

2              (Video played)

3    Q.  And that's your car driving into the frame, right?

4    A.  Yes.

5    Q.  And this is the grocery store, right?

6    A.  Yes.

7    Q.  Okay.  And then you're going to see someone come up to your

8    car, right?  All right.  Is that right?

9    A.  Yes.

10   Q.  Okay.  Now, you saw the rest of this video earlier today,

11   right?

12   A.  Yes.

13   Q.  And no one got out of your car during this video, right?

14   A.  Well, the video doesn't show it.

15   Q.  Okay.  So the video doesn't show it.  You testified on the

16   stand that there were two people in your car?

17   A.  Yes.

18   Q.  Correct?

19   A.  Yes.

20   Q.  One in the front passenger seat?

21   A.  Yes.

22   Q.  And one in the rear passenger seat?

23   A.  Yes.

24   Q.  And then you drove them to this grocery store, that was

25   your testimony?

K1EVBELH                    Bell - cross

1    A.   Yes.

2    Q.   And that was in your affidavit; correct?

3    A.   Yes.

4    Q.   And you don't see them getting out of the car in this

5    video, do you?

6    A.   Not here, no.

7    Q.   Okay.  Not here, no.

8         And, in fact, you actually see your car driving away

9    at the end of this video, right?

10   A.   Yes.

11   Q.   And you didn't get out of the car yourself either, did you?

12   A.   The video doesn't show, no.

13   Q.   So you lied when you said that your friend -- you drove

14   your friends to the grocery store and they got out of the car

15   here; isn't that right?

16   A.   That is not right.

17   Q.   And you lied when you said that you got out of the car to

18   buy a Black & Mild cigarette at this grocery store, right?

19   A.   That is not right.

20   Q.   You don't want to go to federal prison, do you, Mr. Bell?

21   A.   I'm in federal prison now.

22   Q.   You don't want to go -- you don't want to be convicted on

23   these charges, do you?

24   A.   No.

25   Q.   And you're willing to lie in order to avoid being

K1EVBELH                    Bell - cross

1    convicted, aren't you?

2    A.   Not at all.

3    Q.   But you did, in fact, lie here, didn't you?

4    A.   No, I did not.

5    Q.   Well, the video is the video, Mr. Bell.  Are you saying

6    that you're getting out of the car in this video?

7    A.   Yes, I did.

8    Q.   Okay.  When exactly in this video do you get out of the

9    car?

10   A.   This video does not show it.

11   Q.   But you agree that in a few moments you're going to see

12   your car drive away from this grocery store; correct?

13   A.   Yes.

14   Q.   And there you go.

15         So you lied there in paragraph 7 of your declaration.

16   A.   No, I did not.

17         (Counsel conferred)

18   Q.   Well, you also lied to your parole supervisor after you

19   were arrested in connection with this case, weren't you?

20   A.   No, I don't know what you're -- I don't know what you're

21   speaking about.

22   Q.   Okay.  Well, on July 2nd, did you speak to a parole officer

23   named Leon Smith?

24   A.   July 2nd, I'm not sure.

25   Q.   Okay.  But you spoke to a parole officer after you were

1    arrested, right?

2    A.  Many times, yes.

3    Q.  Many times.

4         In fact, and you told your parole officer that you had

5    a male friend who left a book bag containing a firearm in the

6    passenger seat of your car; isn't that right?

7    A.  I do not recall.

8    Q.  You don't recall that.  Okay.  Because it's your testimony

9    today that, in fact, it was your car -- in fact, it was your

10   firearm; correct?

11   A.  Yes.

12   Q.  All right.  So were you lying either -- are you lying

13   either now or are you lying to the parole officer?

14   A.  Wasn't lying at all.

15   Q.  Are you saying that you told the parole officer that it was

16   your gun?

17   A.  I'm saying I did not.

18   Q.  You did not tell the parole officer it was your gun?

19   A.  I do not recall speaking to a parole officer.

20   Q.  But you said just now that you recall speaking to a parole

21   officer many times since you were arrested.

22   A.  Not telling him anything about a gun.

23   Q.  So you're saying you never spoke with a parole officer

24   about your arrest in this case?

25   A.  No, not that I recall, no.

1   Q.  Now, Mr. Bell, before you signed this declaration, you

2   spoke with your attorney; correct?

3   A.  Yes.

4   Q.  And that's Ms. Giwa and Mr. Marcus Amelkin right here?

5   A.  Yes.

6   Q.  And you knew this was an important document?

7   A.  Yes.

8   Q.  And you knew that you needed to include facts that were

9   important to this case here, right?

10  A.  I don't understand that question.

11  Q.  Well, this was your -- this affidavit was your opportunity

12  to tell your side of the story, right?

13  A.  Yes.

14  Q.  Okay.  So you wanted to include everything that was part of

15  your side of the story; correct?

16  A.  I would assume so.

17  Q.  Okay.  And so there is -- so there is nothing in this

18  affidavit --

19          MR. BRADLEY:  And Ms. Fetman, if you could please put

20  the declaration back on the screen please.

21  Q.  There is nothing in this declaration about the marijuana

22  cigarette in your car; correct?

23  A.  Do I have time to read it over?

24  Q.  Of course.  You can take as much time as you need.

25          (Pause)

1          THE WITNESS:  Can you go to the second page please?

2          MR. MARCUS AMELKIN:  Your Honor, I'm just going to

3    bring him a hard copy.

4          (Pause)

5    Q.  So there's nothing about a marijuana cigarette in this

6    declaration; correct?

7    A.  That's incorrect.

8    Q.  Okay.  You didn't say anything about how -- you did not say

9    anything about how it was your girlfriend smoking in the car;

10   correct?

11         MR. MARCUS AMELKIN:  Objection.

12         Misstatement of testimony.

13         THE COURT:  Overruled.

14   Q.  Mr. Bell?

15   A.  Yes.

16   Q.  You didn't say anything about your girlfriend in this

17   declaration, right?

18   A.  No.

19   Q.  You didn't say anything about your girlfriend smoking in

20   your car?

21   A.  No.

22   Q.  You didn't say anything about you emptying your ashtray?

23   A.  No.

24   Q.  Okay.  You didn't think that was important?

25   A.  Not sure.

1   Q.  Mr. Bell, earlier you testified that you didn't remember

2   what you told your parole officer after -- or a parole officer

3   after you were arrested in this case?

4   A.  Yes.

5           MR. BRADLEY:  Your Honor, may I approach?

6           THE COURT:  Yes.

7   Q.  Mr. Bell, I'm handing you a document.  Can you please read

8   here and look up when you're done?

9   A.  It says prelim will be scheduled for 7/9/19.  Final for

10  7/9/19.

11  Q.  Mr. Bell, sorry.  Just because it's not in evidence yet,

12  can you please read it to yourself.

13          (Pause)

14  Q.  Does that refresh your recollection about what you said?

15  A.  No.

16  Q.  Okay.  I'll come back and take --

17          MR. BRADLEY:  Your Honor, may I approach?

18          THE COURT:  Yes.

19          MR. BRADLEY:  Your Honor, the government -- excuse me,

20  your Honor.

21          Your Honor, at this time the government would like to

22  offer this document as Government Exhibit 500.  This is a

23  report from the Department of -- New York State Department of

24  Corrections and Community Supervision that was provided by

25  defense counsel at the beginning of this hearing.

1          It contains a business record certification and also

2     the statement on page 3 that I used to refresh or attempted to

3     refresh the defendant's recollection.  Contains the defendant's

4     own statements that he made to parole.

5               THE COURT:  Received.

6               (Government's Exhibit 500 received in evidence)

7               MR. BRADLEY:  Your Honor, may I publish this for the

8     Court?

9               THE COURT:  Yes.

10              MR. BRADLEY:  Specifically, your Honor, the statement

11    I'm referring to is on page 3.

12              MR. MARCUS AMELKIN:  I have another copy, if you want.

13              MR. BRADLEY:  Your Honor, just before I conclude, I'd

14    just like to read this into the record on page 3.  And that

15    refers to, as I mentioned, a parole officer named Leon Smith.

16    On July 2nd, 2019, 1:25 p.m., it says:  "Subject was served his

17    VOP charges.  A copy of his release papers, hearing process was

18    explained to subject several times.  Subject elected to have a

19    preliminary hearing.  Prelim will be scheduled for July 9,

20    2019; final for July 19, 2019.  When P.O. inquired about

21    arrest, subject reported that he was dropping off a male friend

22    in Bronx, New York.  Subject reported that the male friend left

23    the book bag containing the firearm in the passenger seat of

24    the subject's car.  Subject reported that he was not smoking

25    marijuana."

1              No further questions, your Honor.

2              THE COURT:  Thank you.

3              MR. MARCUS AMELKIN:  I have a few redirect.

4    REDIRECT EXAMINATION

5    BY MR. MARCUS AMELKIN:

6    Q.  Mr. Bell, you're charged with violating your parole because

7    of this arrest; correct?

8    A.  Yes.

9    Q.  And you're represented by counsel for your parole case?

10   A.  Yes.

11   Q.  And your parole counsel will make arguments on your behalf

12   to the parole board; correct -- or the parole administrative

13   judge?

14   A.  Yes.

15   Q.  Mr. Bell, you don't know -- do you know where the marijuana

16   cigarette that the police vouchered came from?

17   A.  No.

18   Q.  When you testified, you were just -- were you saying that

19   that cigarette came from your girlfriend?

20   A.  Can you repeat that question again?

21   Q.  When you testified on direct, were you saying that the

22   cigarette that they found came from your girlfriend?

23   A.  Strong possibility, yes.

24   Q.  It's a possibility, but you're not sure, right?

25   A.  Yes.

1    Q.  And in the time -- in the day or two before you were

2    arrested, did anybody smoke marijuana in your car?

3    A.  Possibility.

4    Q.  On the day that you stepped into your car when you left

5    work, did your car smell like anything?

6    A.  No.

7    Q.  Did it smell like marijuana?

8    A.  No.

9    Q.  Was there any marijuana cigarette in plain view?

10   A.  Not at all, no.

11   Q.  Thank you.

12           THE COURT:  All right.  Thank you.

13           Anything further?

14           MR. BRADLEY:  No, your Honor.

15           THE COURT:  Okay.  You are excused, sir.

16           (Witness excused)

17           THE COURT:  Anything else from the defense?

18           MR. MARCUS AMELKIN:  What's that, your Honor?

19           THE COURT:  Anything else from the defense?

20           MR. MARCUS AMELKIN:  No.  Just argument, your Honor.

21           THE COURT:  Okay.  Let's have at it.

22           Government's burden.

23           MR. BRADLEY:  Thank you, your Honor.

24           As mentioned in the government's motion to suppress --

25   and I believe the Court accurately pointed out the issues at

1    play here at the beginning of this hearing.  And specifically,

2    your Honor, and as -- I believe the testimony today

3    significantly reinforced the points that the government made in

4    its opposition brief.

5              And specifically, it's really two points.

6              The first is that the officers' stop of the

7    defendant's car was entirely lawful and based on multiple

8    independent factors.

9              First, you saw video evidence today that the

10   government -- that was admitted and stipulated to by the

11   parties showing the defendant's car double-parked on East 137th

12   Street.  You heard testimony from Officer Medina who said that

13   he observed that car double-parked; and also from Officer

14   Pando, who saw that car double-parked as well, after he had

15   received the radio call.

16             And also, your Honor --

17             THE COURT:  Let's assume that the stop is okay based

18   on the traffic violations, at least.  What you've got to

19   justify is the search.

20             MR. BRADLEY:  Yes, your Honor.

21             And again, I would submit to the Court that there are

22   multiple independent reasons for the defendant -- for the

23   search ultimately of the defendant's backpack.

24             First, as you heard from both Officer Medina and

25   Officer Pando, as both of the officers approached the car, the

1   driver's side windows were open, and that both of them had

2   observed a strong odor of marijuana.  That odor of marijuana,

3   while certainly provides a basis for further inquiry, and that

4   suspicion, your Honor, was confirmed when you heard testimony

5   from both Officer Medina and Officer Pando that they observed a

6   marijuana cigarette in the center console within inches of each

7   other when they testified on the stand today.

8          You saw that Officer Pando said that he -- both of

9   them said that they recognized the marijuana cigarette based on

10  their training and experience.  They also noted that that

11  marijuana cigarette was confirmed -- essentially what they had

12  smelled earlier, which was that odor of marijuana; not only

13  that Officer Medina observed when he approached the car on St.

14  Ann's Avenue, but also what he smelled marijuana when he was

15  driving on East 137th Street.

16         Furthermore, your Honor -- and the parties have

17  stipulated in this case, you heard Officer Medina say that he

18  recovered that marijuana from the car after it was brought back

19  to the precinct.  He vouchered it in the evidence bag himself.

20  And the parties have stipulated that that substance that was

21  vouchered was, in fact, marijuana.

22         And, your Honor, I believe that the automobile

23  exception provides more than sufficient justification under

24  those circumstances; and that the case law cited by the

25  government in its opposition brief notes that not only the

1    smell of contraband, but also the physical presence of

2    contraband in a car such as the defendant's is enough to

3    trigger the automobile exception, which would not only allow --

4    provide probable cause for the officers to search the car, but

5    also the containers within it, that would include the backpack.

6            Also, your Honor --

7            THE COURT:  So your position is that if the cigarette

8    actually existed and was in plain view, they could have opened

9    up the backpack.

10           MR. BRADLEY:  Yes, your Honor.

11           THE COURT:  Even if it was entirely closed.

12           MR. BRADLEY:  Exactly, your Honor.

13           THE COURT:  On what theory?

14           MR. BRADLEY:  On the theory, your Honor, that there

15   would be evidence -- based on the observation of the officers

16   looking at the car, not only smelling the marijuana, but also

17   observing marijuana directly in the center console, that the

18   officers had probable cause to suspect that there was

19   contraband in the defendant's vehicle.  That contraband, your

20   Honor, that probable cause to believe that there was contraband

21   in the defendant's vehicle would justify the officers'

22   subsequent search of the defendant's backpack, independent of

23   Officer White's observations, your Honor.

24           Furthermore, separate and apart from the automobile

25   exception, the search incident to arrest doctrine also provides

1    probable cause for the officers to search the area of an

2    unsecured defendant within the passenger space of an area that

3    he could potentially be reaching into.

4            THE COURT:  But by the time White goes into the bag,

5    the defendant is out of the car.

6            MR. BRADLEY:  The defendant is out of the car, and you

7    could see on the body camera video that he is against the car,

8    and that his hands are over the vehicle.  He is not, as, for

9    example, in *Arizona v. Gant*, secured inside the squad car,

10   entirely away from the passenger compartment.

11           THE COURT:  But he's up against the car, and there are

12   five cops around him.

13           MR. BRADLEY:  That's correct, your Honor.  But the

14   defendant is not secured at that time.

15           And under both the independent theories of a search

16   incident to arrest based on the traffic violation -- you heard

17   two traffic violations that were testified to by Officers Pando

18   and Officer Medina, but also the possession of marijuana in the

19   car.  And I should note, your Honor, that the defendant was, in

20   fact, charged with possession of marijuana in the state

21   court -- in his state court charges that were ultimately

22   dismissed in favor of this prosecution here.  And those papers,

23   that complaint, was submitted as part of defendant's motion to

24   suppress paperwork.

25           But I think, separate and apart from all that, your

1   Honor, the automobile exception -- that, again, that's just

2   another avenue for the defendant -- excuse me, for the officers

3   to search the containers and the closed containers within the

4   car.  But primarily, your Honor, this is a case that really

5   does implicate the automobile exception.  And I believe,

6   respectfully, that this is something that we've seen, that

7   multiple courts in this district have upheld searches under

8   very similar situations.

9           And finally, your Honor, that search would also be

10  independently authorized under the plain view doctrine, based

11  on what Officer White observed in the backpack.  So separate

12  and apart from what the officers observed with regard to the

13  marijuana cigarette and the smell of marijuana, you heard that

14  Officer White testified that he had seen the backpack partially

15  open, and that there was an object inside that caught his eye.

16          And the testimony you heard today, your Honor, was

17  that that reason why that caught his eye was because it was

18  clear or transparent, and he could see the parts of the

19  ammunition inside.  And that it caught his eye precisely

20  because he had never seen something like that before in all of

21  his years working on the New York City Police Department, which

22  he said was approximately ten.

23          Your Honor, based on that plain view, the officers had

24  an independent basis to search the backpack, which they did.

25          So essentially, your Honor, what you have here is you

1    have the search of the backpack justified based on the

2    automobile exception, based on the drug contraband smelled and

3    seen inside the car as a search incident to arrest, based on

4    the marijuana cigarette, and as well as the traffic violations,

5    and based on the plain view doctrine, based on Officer White's

6    independent observations of the backpack.

7           I'd finally just note, your Honor, that, as, again, we

8    would have pointed this out regardless if the defendant

9    testified, because the defendant's affidavit or declaration, as

10   we pointed out, contains numerous inconsistencies with the

11   evidence that we've seen on the video footage alone.

12          But the defendant's account of the offense is just

13   patently false and did nothing to undercut the government's

14   evidence in this case and, in fact, does just the opposite.

15          The defendant -- as the Court noted, it's -- the issue

16   of the lawfulness of the stop is essentially not in dispute.

17   But his story about the girlfriend potentially smoking the

18   marijuana or potentially having the marijuana cigarette is

19   something that the Court frankly should not be crediting in

20   this case.  And his willingness to lie, your Honor, as you've

21   seen on the stand today on multiple instances elicited during

22   cross-examination, shows that the defendant really is covering

23   up what really happened.

24          So for those reasons, your Honor, the government

25   respectfully submits that there are multiple independent bases

1  for the Court to deny the defendant's motion to dismiss.  And

2  the government respectfully requests that the Court do so.

3           THE COURT:  Okay.  Thank you.

4           Mr. Amelkin.

5           MR. MARCUS AMELKIN:  Thank you, your Honor.

6           May I have some water before I begin?

7           THE COURT:  I'm sorry, I couldn't --

8           MR. MARCUS AMELKIN:  May I have some water before I

9  begin?

10          THE COURT:  Sure.

11          MR. MARCUS AMELKIN:  Your Honor, the government did

12  not meet its burden today, and the Court should suppress the

13  evidence recovered.

14          The bottom line is the officers did not testify

15  credibly.  This complaint, when it was received, read like a

16  law school civ pro exam -- a crim pro exam, excuse me, with

17  basically every single attempt to avoid admitting what truly

18  happened, which is that Officer White reached in, he opened the

19  bag, he found a gun, and then they justified the stop.

20          We know that the officers are not being truthful from

21  the video evidence, from the testimonial evidence, from

22  Mr. Bell's evidence -- from Mr. Bell's testimony.

23          So first, just in terms of the legal arguments, I just

24  want to briefly respond to the search incident to arrest

25  argument.  That would expand *Gant* so far beyond what *Gant*

1    stands for, that it's not an acceptable legal argument.

2            Mr. Bell was in custody when five officers were

3    surrounding him.  The officers were safe.  He had nowhere close

4    to be in the grabbable area of the backpack.

5            So what we're left with is either plain view or -- it

6    really comes down to plain view.

7            So first I want to talk about parking.

8            It's true that Mr. Bell committed a traffic violation,

9    we know that from the video.  But we don't know, based upon the

10   officers' testimony, that they witnessed one.  Officer Medina

11   testified that there is an exception to the double-parking

12   rule; that if you're briefly dropping somebody off, and then

13   you go, you're not double-parked.  And when they drive past him

14   almost immediately --

15           THE COURT:  The only evidence that he dropped somebody

16   off is his say-so.

17           MR. MARCUS AMELKIN:  That's correct, your Honor.

18           THE COURT:  And frankly, given the video, it's not

19   credible.

20           MR. MARCUS AMELKIN:  Thank you, your Honor.

21           I think that we asked the government for earlier video

22   in time.  We do believe that that video would show people

23   exiting his car.  We don't have that video.  But that's our

24   view on that point.

25           Now, the next point I want to make is that nowhere in

1   the video do we see smoke emanating out of Mr. Bell's car.

2   Moreover, it is suspect that when they do an inventory search

3   and a search of the car, the ashtray that Officer Medina

4   admitted was in the car was not inventoried or vouchered, and

5   that the remaining items within that ashtray were not

6   preserved.  It's important --

7              THE COURT:  What remaining items are you talking

8   about?

9              MR. MARCUS AMELKIN:  Any other butts.

10             THE COURT:  Any other.  That is to say the remaining

11  items, if there were any other items.

12             MR. MARCUS AMELKIN:  Right.

13             But the important part about the ashtray is that it

14  shows that any butt that was put out would be inside that

15  ashtray and not in plain view.

16             THE COURT:  No, it doesn't actually.

17             MR. MARCUS AMELKIN:  It is our argument that it

18  doesn't make sense that when a person is pulled over, and they

19  are sitting in their car and they have several moments before

20  the officer arrived, that they wouldn't then put it in the

21  ashtray if it was burnt.

22             THE COURT:  Well, if he's had a criminal procedure

23  course maybe, but --

24             MR. MARCUS AMELKIN:  That's really our points too as

25  to his story.  Mr. Bell didn't testify to get around the

1    warrant exception.  This is what happened to him, and he shared

2    his experience with you here in court today.

3            Now, it's important to note that Officer White

4    testifies that he saw the ammunition in plain view.  But then

5    he doesn't alert to ammunition being in plain view.  He only

6    alerts after he takes the backpack and searches it, which goes

7    to his credibility as to whether or not he actually saw the

8    ammunition in plain view.

9            THE COURT:  That's just not clear from the evidence.

10   Maybe it's right, but it's not clear.

11           MR. MARCUS AMELKIN:  It's clear if you watch the body

12   cam videos.

13           THE COURT:  I did.

14           MR. MARCUS AMELKIN:  And that he searches the bag,

15   slowly and methodically.  And then when he has it open, and he

16   reaches his hand in, that's when he says the 92.  The other

17   officers are still conversing with Mr. Bell at the front of the

18   car.  And only after he reaches in --

19           THE COURT:  But, look, if he sees something in the

20   interior of the bag, and he picks the bag up, and what he saw

21   that was in plain view drops into the interior -- which is

22   entirely possible, given what he said about the positioning of

23   the bag and what we saw in the videos -- he's entitled to go in

24   after what he saw in plain view, isn't he?

25           MR. MARCUS AMELKIN:  Yes, if he actually saw the

1      bullets, which he did not.

2                 THE COURT:  I'm not sure it matters what exactly it

3      was.  Something caught his eye that was suspicious.  And he's

4      entitled to go in and verify it, isn't he?

5                 MR. MARCUS AMELKIN:  Only if there is -- he had

6      reasonable suspicion to believe that he would recover

7      contraband.  But in this instance, it's our -- as the Court

8      basically cross-examined for us, there was no reasonable way

9      that this ammunition was in plain view.  This is a flat

10     backpack with a huge zipper, and he is saying that it's peeking

11     out just enough for him to see bullets.  And then he said on

12     redirect --

13                THE COURT:  He said it didn't protrude.  That was the

14     magic phrase.

15                MR. MARCUS AMELKIN:  Well, if that's the case, your

16     Honor, he is looking in from above to something that's not

17     protruding, he can't see it.  He just can't see it.

18                And his CCRB complaints, which we didn't cross on, but

19     the Court is aware of from the government's papers, two

20     substantiated complaints, one of which it was a marijuana

21     plant, a plant, like they placed it there.

22                THE COURT:  That's not what I remember, but you may be

23     right.

24                MR. MARCUS AMELKIN:  And it's very important to note

25     that Officer Medina testified that the marijuana was not

K1EVBELH                    Summation - Mr. Marcus Amelkin

1    removed from the car until it was brought back to the station.

2    Officer White is alone in that car from the arrest until the

3    station.  He drives the car back with the marijuana, the

4    marijuana, as they claim, in it in plain view.  And yet he

5    doesn't remember ever seeing that marijuana.

6           Nobody pulls the marijuana out at the time of arrest.

7    We don't see it in any of the videos, and none of them

8    testified to it.  And Officer Medina, in fact, testified that

9    the marijuana stayed in the car going to the precinct, and then

10   he vouchered it.

11          Officer White is alone in the car.  He does not

12   remember seeing the ashtray.  He does not remember seeing the

13   marijuana in plain view, though he's alone in the automobile

14   that apparently, based upon his testimony, reeks of marijuana

15   for ten minutes.  That doesn't make sense.  And that goes to

16   his credibility, and that goes to the officer's credibility.

17          And if Officer White is lying about seeing the gun in

18   plain view, then this should result in suppression.  Because

19   how can we accept the officer's testimony as a whole, when the

20   pivotal point is a lie?  And it is in this case.  It doesn't

21   make sense physically.  It doesn't make sense rationally for a

22   person who had been in prison for as long as Mr. Bell had been

23   in prison and had been doing well on parole, to make a mistake

24   like that.  The mistake he made, of course, is having the gun.

25          THE COURT:  That was a beaut.

1    MR. MARCUS AMELKIN:  That was a very bad mistake.  And

2    he's been in jail for seven months now because of it.  And he

3    will get a parole hit because of it.  And he'll get that parole

4    hit regardless of what the Court does most likely.

5    But the bottom line is is that they did not search

6    legally.  And then they came in and they lied about what they

7    saw.  And in so doing, the Court should not allow for this

8    evidence to be submitted at trial.

9    Thank you, your Honor.

10    THE COURT:  Thank you.

11    Mr. Bradley, suppose that I don't buy the assertion

12    that they smelled marijuana from the passing police car.  Just

13    suppose.  Suppose I don't buy that the magazine was in plain

14    view.  Where are you?

15    MR. BRADLEY:  Well, respectfully, your Honor, with

16    regard to -- I guess there's two parts to that.  The first is

17    with regard to the lawfulness of the stop --

18    THE COURT:  The stop is fine.

19    MR. BRADLEY:  Okay.  I wasn't sure what you were

20    referring to there with regard to the observations on 137th

21    Street.

22    THE COURT:  No, you have the traffic violations.  I

23    understand that.

24    MR. BRADLEY:  Right.

25    So if I'm hearing the Court correctly, it's what would

the government's position be if you believed the officers did

not smell marijuana upon approaching the vehicle on St. Ann's

Avenue.

          THE COURT:  I said driving by.

          MR. BRADLEY:  Driving by on 137.

          Well, then, respectfully, your Honor, then this is a

case -- I don't believe that changes the government's calculus

or argument at all.  I respectfully don't believe the Court

needs to really decide on those issues with regard to what

Officer White found because, specifically, this is a case which

you heard testimony from the officers about that they smell a

strong odor of marijuana as they approached the vehicle, when

it was parked, when it was pulled over on St. Ann's Avenue at

the corner of 139th Street.

          They approached the vehicle.  They smelled marijuana.

So they already had reasonable suspicion -- if not probable

cause -- to believe there was contraband inside the car at that

point.  But those suspicions were confirmed by the presence of

marijuana that they saw inside the car in the form of a

marijuana cigarette.  You heard testimony from Officer Medina,

and you heard testimony from Officer Pando on that point.

          And respectfully, your Honor, the defense's theory

that -- and that really attempts to undercut this, it just

strikes the government as essentially a plant theory.  And I

would respectfully submit to the Court that that's just not

1    plausible or really credible under the circumstances here.

2           You heard that officers testified that they smelled

3    marijuana immediately upon approaching the vehicle; and that

4    Officer Pando, who said that he's been trained in the

5    recognition of narcotics, including marijuana, said that he --

6    that he recognized that based on his -- the marijuana cigarette

7    based on his training and experience.  And it was that

8    observation that led to him asking the defendant -- ordering

9    the defendant to step out of the car.

10          At that basis, your Honor, not only do you have, as

11   I've previously mentioned, the search incident to arrest

12   doctrine for both the traffic violation and the possession of

13   marijuana charge that the defendant was ultimately charged with

14   in connection with everything else in this case, but then -- so

15   you have the search incident to arrest doctrine.  But you also

16   have probable cause under the automobile exception based on the

17   probable cause that -- in which the Second Circuit has defined

18   as a fair probability that based on the officers' observations,

19   they had reason to believe that there was contraband inside the

20   vehicle.  They not only saw the contraband inside the vehicle,

21   but that contraband could very well be inside closed

22   containers.  And that's precisely what the automobile exception

23   provides for the officers in this case.

24          So respectfully, your Honor, the government's position

25   would not be changed with regard to the legality of the search

K1EVBELH

1      of the backpack.

2              THE COURT:  Mr. Amelkin, do you agree that if I find

3      that the police smelled marijuana once they stopped the car,

4      they had a right, under the automobile exception, to search the

5      backpack?

6              MR. MARCUS AMELKIN:  I think that's legally accurate.

7              THE COURT:  Pardon me?

8              MR. MARCUS AMELKIN:  I think that's legally accurate.

9              But, your Honor, if you do not believe that they

10     smelled it when they drove past, and if you do not believe that

11     they saw it in plain view, then they lied in a sworn complaint,

12     they lied to a grand jury, they lied to this Court today.

13             And suppression comes down to credibility.  And the

14     police are not -- if they are not credible about certain

15     points, we cannot allow the seizure to stand.

16             THE COURT:  No, but, look, you know the charge in

17     every case, the *falsus in uno* charge to the jury, which is that

18     if you find somebody lied about a material fact, they are

19     entitled to disregard that person's testimony entirely.  But

20     you are also entitled to put aside the false part and rely on

21     anything you think is credible.

22             MR. MARCUS AMELKIN:  That's correct, your Honor.

23             I would say that there are a few points why you should

24     take it a step further and not think that they smelled

25     marijuana.  But before I do that, I just want to note that the

1    government made a legally incorrect statement, which is that

2    you cannot search incident to a traffic stop, because the NYPD

3    can't arrest for double-parking.  So there's no search incident

4    to arrest allowed for just a traffic stop.

5              THE COURT:  How about the illegal turn?

6              MR. MARCUS AMELKIN:  No.  Same.

7              For minor traffic stops, under United States v. --

8    *People v. Marsh*, New York Supreme Court forever, they cannot

9    search for a run-of-the-mill traffic stop.  And I think that

10   the circuit has cited favorably to that case.

11             So really what we're talking about is the marijuana.

12   And none of the officers alert at all to marijuana.  None of

13   the officers hold up the roach.  None of the officers show him,

14   Hey, man, I'm giving you a violation on this before --

15             THE COURT:  But the roach is ultimately immaterial,

16   except arguably to credibility, in light of the concession that

17   the proposition I put to you is legally accurate.  That is,

18   that if they smelled the marijuana when they approached the car

19   at the stop, they had the right to search the bag.

20             MR. MARCUS AMELKIN:  I think that it's clear that they

21   did not actually smell marijuana at all.  And I think we know

22   that because Officer White, who was alone in the car, doesn't

23   ever see it and doesn't alert to it.  I think that --

24             THE COURT:  Sorry.  Doesn't ever see --

25             MR. MARCUS AMELKIN:  The marijuana in plain view.

1    And he is the one who searched the car and searched

2    the bag.

3         But moreover --

4         THE COURT:  But wait a minute.  You're going beyond

5    the proposition I put to you.  The proposition I put to you

6    excludes the roach.  Ignore the roach for a minute.

7         If I find that they smelled marijuana when they

8    approached the car after the stop, did they have the legal

9    right to search the bag?

10        MR. MARCUS AMELKIN:  I think it depends on where they

11   smelled the marijuana.

12        THE COURT:  From the car.

13        MR. MARCUS AMELKIN:  If they believe that they smell

14   marijuana in the car, then, yes, they may search the bag.  That

15   is legally right.  I do not think it is factually right.  And I

16   don't think it is credible, given the evidence, given -- you

17   have the parole records in front of you.  This is a person who

18   has not tested positive the entire time he's been out; he's not

19   using marijuana; he successfully completed a long drug program.

20        THE COURT:  It doesn't have to have been him.

21        MR. MARCUS AMELKIN:  It does, your Honor, because

22   there's no -- they testified it was burning marijuana.  There's

23   not -- there's no evidence -- there's no way and it's not

24   factually acceptable --

25        THE COURT:  I thought the testimony was to the

1    contrary about that.

2              MR. MARCUS AMELKIN:  No.  All the officers except

3    White said that they smelled burning marijuana.  White said he

4    didn't know the difference, he couldn't tell the difference.

5              But what's important to note is if there is that small

6    amount of marijuana sitting in an ashtray, if it was in that

7    black water jug, you're not going to smell it, especially if

8    it's long extinguished.  It's just not possible.  And there are

9    scientific studies --

10             THE COURT:  Frankly, I couldn't tell you one way or

11   the other.

12             MR. MARCUS AMELKIN:  But you know from experience that

13   if you walk into -- look, you've been in New York a long time.

14   The city used to smell like crack because people smoked

15   indoors, right?  But in an ashtray, once a butt is out, it is

16   not the same as freshly burning cigarettes.  Once a cigarette

17   butt is out in an ashtray, that's it.  You'd have to be right

18   up on it to smell it.

19             THE COURT:  My mother must have been smoking something

20   else.

21             MR. MARCUS AMELKIN:  Well, your house stunk.

22             THE COURT:  And those ashtrays stunk the house up from

23   the time I was born.

24             MR. MARCUS AMELKIN:  Right.

25             Burning marijuana has a distinct smell, your Honor.

1    THE COURT:  Well, that I couldn't tell you, but I

2    accept it.

3    MR. MARCUS AMELKIN:  The bottom line is they were not

4    credible.  They were not truthful.

5    THE COURT:  I know.  And you want me to punish them

6    for that.  I understand that.

7    MR. MARCUS AMELKIN:  No, I'm not asking you to punish

8    them.  I'm just asking you to follow the Fourth Amendment here.

9    THE COURT:  Yes, but you're telling me that if I

10   accept the truth of the statements, that they smelled it upon

11   approaching the car once the stop was made, they had the right

12   to do what they did.  They may have gilded the lily pretty

13   extensively, not a bad argument from your point of view, but --

14   MR. MARCUS AMELKIN:  I just don't understand how the

15   Court could say that an officer of the law came in here under

16   threat of perjury and lied.  And then accept this small sliver

17   of their testimony such that the search will stand.

18   They know -- as we cited to you in our suppression

19   brief, in New York State, in the New York Supreme Court, in the

20   Bronx County, the smell of marijuana is like your mother's

21   ashtray.  It is ever present on these streets.  And they also

22   know that plainclothes units are lying about it.  They are

23   lying about it because they know about the automobile

24   exception, and they know how wide of a birth it gives you.

25   THE COURT:  You're talking to somebody who remembers

1    the scandal over dropsy testimony 50 years ago.  So I

2    understand the point you're making.

3              MR. MARCUS AMELKIN:  Thank you, your Honor.

4              THE COURT:  You should some day read Irving Younger's

5    wonderful article about that subject, or his opinion actually.

6              MR. BRADLEY:  Your Honor, if I may.

7              THE COURT:  Yes, let's just wrap it up.

8              MR. BRADLEY:  I do want to wrap this up very briefly,

9    your Honor.  I just want to touch on a couple of points.

10             And the first is that I do not believe -- first of

11   all, the testimony from -- Officer White did not testify that

12   he searched the car.  That might have been Mr. Marcus Amelkin

13   misspeaking, but I just want to note that for the record.  I

14   don't think -- that was probably inadvertent.

15             With regard to the testimony about --

16             THE COURT:  Is it correct that he drove the car back

17   to the station?

18             MR. BRADLEY:  He did not recall -- he said he did not

19   recall.  He was shown the body camera video.  And he said

20   that -- and I believe he said he agreed to doing that, but he

21   said that he did smell marijuana in the car.

22             THE COURT:  Well, does the video show him getting into

23   the car to drive it somewhere or not?

24             MR. BRADLEY:  It appears that based on the people on

25   the scene, that it may have been Officer White getting into the

1    car.  I don't think it definitively showed him.

2               THE COURT:  Well, he didn't argue with the proposition

3    that it was him.

4               MR. BRADLEY:  No, I don't believe so, your Honor.  I

5    believe it was him getting into the car.

6               THE COURT:  Okay.

7               So then it's a reasonable inference that he drove the

8    car back to the station.

9               MR. BRADLEY:  Right.

10              THE COURT:  And there's a roach sitting in the ashtray

11   right in front of him.

12              MR. BRADLEY:  And he testified --

13              THE COURT:  And he doesn't remember.

14              MR. BRADLEY:  He said he didn't remember.

15              But you did hear Officer Medina testify and Officer

16   Pando testify to what they saw when they approached the car, in

17   addition to what they smelled.  And you heard Officer Medina

18   and Officer Pando both say why they didn't voucher it at the

19   time, because they didn't have narcotics testing envelopes.

20              THE COURT:  Right.  I got all that.

21              But didn't Pando also say, well, he doesn't remember

22   anything about it being in an ashtray?

23              MR. BRADLEY:  I believe his testimony was that he

24   thought it was in some sort of an ashtray.

25              THE COURT:  He said there was a little cubbyhole ahead

K1EVBELH                    Rebuttal - Mr. Bradley

1    of the gearshifter.

2          MR. BRADLEY:  Right.  He specifically did use the word

3    "ashtray," your Honor.  But he just placed it a couple of

4    inches away from where Officer Medina --

5          THE COURT:  My recollection of that's a little

6    different, but --

7          MR. BRADLEY:  I would just note, your Honor, that --

8          THE COURT:  (Reading)

9    "Q.  Does taking a look at that refresh your recollection about

10   the ashtray that was in the car when you approached it?

11   "A.  No, ma'am.

12   "Q.  So where in the center console was the marijuana

13   cigarette?

14   "A.  From what I can remember, there was cupholders, there was

15   the shifter, and a small area right past the shifter where I

16   believe the marijuana cigarette was at.  That's where I

17   remember it being."

18         MR. BRADLEY:  I believe he also referred to that area

19   as an ashtray, your Honor.  But, again, I believe the Court's

20   recollection obviously controls.

21         But I just want to point out, your Honor, that this is

22   a case where, you know -- and also the -- I believe the

23   testimony from the officers is that they said that they

24   appeared to be recently burned, the marijuana cigarette that

25   they found; and that the testimony we're hearing today, your

1    Honor, is heavily corroborated on multiple fronts.

2             But specifically with regard to the marijuana

3    cigarette, that was inventoried, it was vouchered by Officer

4    Medina, you heard that he took it out of the car, and it was

5    vouchered in this case.  And the defense has stipulated that

6    that substance was tested and returned positive --

7             THE COURT:  Nobody is arguing that they vouchered

8    something.  Nobody is arguing that it wasn't marijuana that

9    they vouchered.  It's just like -- the defense argument is it's

10   like the dropsy cases.  Certainly there were glassine bags full

11   of heroin that were vouchered and turned into the lab and

12   tested for heroin.  The question is who threw them there, the

13   cop or the guy who was allegedly running away.  That's what

14   those cases are all about.

15            MR. BRADLEY:  I understand, your Honor.

16            But, respectfully, I don't believe there was any

17   evidence in this case in the record that suggests that that

18   sort of, I guess, essentially misconduct occurred in this case.

19   I mean, you have heard the testimony from the officers, and you

20   just have not -- I mean, I have heard the defendant's

21   suggestion that that didn't happen, but that's simply not

22   supported by the record.

23            THE COURT:  Look, this is a very troublesome case for

24   a lot of reasons.  It's very troublesome because Mr. Bell has

25   made clear -- obviously it can't be used against him at trial,

1  if we ever get there, but he has made clear that here he is a

2  convicted felon and he's carrying a gun, a semiautomatic with a

3  loaded clip.  That's serious business.

4      I have significant reservations -- although I haven't

5  ultimately made up my mind -- about whether it is at all likely

6  that Officer White saw anything in that bag in plain view.  I

7  do.  That's the bottom line.

8      The roach, we've been exploring the problems with that

9  for the last few minutes.

10     I have real trouble with the incident-to-arrest

11 argument, because I think, pushing it as far as the government

12 is trying to push it here is pretty difficult when the guy

13 there is up against the car with his hands on the roof with

14 five cops around him.  There's no reason for a search of the

15 car in those circumstances to protect the safety of the police,

16 which is what the search incident to arrest doctrine is all

17 about.

18     Now, obviously I'll reread your cases and so forth,

19 but it seems to me we come back to the automobile exception,

20 the roach, and the aroma.  That's what we come back to.

21     And I think what I'm going to do is think about it a

22 little bit, and we'll leave it at that.

23     I appreciate everybody working hard to get the hearing

24 finished this afternoon.

25     MR. MARCUS AMELKIN:  I was hoping I could leave you

1   with one point and also a request.

2          THE COURT:  Yes.

3          MR. MARCUS AMELKIN:  One point I want to make is we're

4   not asking you to find a dropsy; we're saying it's possible it

5   was a dropsy, it's also possible that it was a --

6          THE COURT:  I know.  You're asking me to say that I'm

7   not persuaded by a preponderance of the evidence.  Believe me,

8   I know the difference.

9          MR. MARCUS AMELKIN:  Okay.

10         THE COURT:  And, you know, I take it very seriously.

11  It's very serious for everybody.  It's serious for the public

12  and it's serious for the defendant.

13         MR. MARCUS AMELKIN:  Thank you, your Honor.

14         THE COURT:  Couldn't be more serious.

15         MR. MARCUS AMELKIN:  And the second issue is in

16  order -- with the trial date on Tuesday, I was hoping you can

17  just adjourn the trial -- look, we're going to be clear.  We've

18  admitted the crime.  We're not planning to go to trial on the

19  felon-in-possession.

20         THE COURT:  I understand.

21         MR. MARCUS AMELKIN:  But we would like the ability to

22  receive -- if we are to lose, which we believe we should win,

23  we'd like the ability to receive all the acceptance points.

24         THE COURT:  Look, this is a very serious motion.  And

25  I'm not making any promises, but I wouldn't be too worried

K1EVBELH

1    about that.

2                MR. MARCUS AMELKIN:  Thank you, your Honor.

3                THE COURT:  Okay.  All right.  Thank you, folks.

4                          *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1EVBELH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        INDEX OF EXAMINATION

2   Examination of:                        Page

3   CHRISTOPHER MEDINA

4   Direct By Mr. Bradley . . . . . . . . . . . . . 2

5   Cross By Ms. Giwa . . . . . . . . . . . . . .29

6   Redirect By Mr. Bradley . . . . . . . . . . 55.

7   Recross By Ms. Giwa . . . . . . . . . . . . .56

8   MICHAEL PANDO

9   Direct By Mr. Bradley . . . . . . . . . . . .57

10  Cross By Ms. Giwa . . . . . . . . . . . . . .65

11  YAHKEEM WHITE

12  Direct By Mr. Bradley . . . . . . . . . . . .75

13  Cross By Mr. Marcus Amelkin . . . . . . . . .99

14  DEMETRUES BELL

15  Direct By Mr. Marcus Amelkin . . . . . . . . 111

16  Cross By Mr. Bradley . . . . . . . . . . . . 122

17  Redirect By Mr. Marcus Amelkin . . . . . . . 134

18

19

20

21

22

23

24

25

```
 1                      GOVERNMENT EXHIBITS
 2    Exhibit No.                              Received
 3    400   . . . . . . . . . . . . . . . . . . 8
 4    304, 305  . . . . . . . . . . . . . . . . 8
 5    1, 200, 200-S1, 201, 202  . . . . . . . . .10
 6    200A   . . . . . . . . . . . . . . . . . .12
 7    101   . . . . . . . . . . . . . . . . . . .24
 8    2   . . . . . . . . . . . . . . . . . . . .24
 9    102, 103  . . . . . . . . . . . . . . . . .26
10    302, 306, 307, 308, 309, 311, 312  . . . . .28
11    310   . . . . . . . . . . . . . . . . . . .97
12    500   . . . . . . . . . . . . . . . . . . 133
13
14
15                       DEFENDANT EXHIBITS
16    Exhibit No.                              Received
17    A   . . . . . . . . . . . . . . . . . . . .42
18
19
20
21
22
23
24
25
```